INTEL CORPORATION, Plaintiff,

v.

The HARTFORD ACCIDENT AND INDEMNITY COMPANY, et al., Defendants.

No. C 87–20434 RPA.

United States District Court,
N.D. California,
San Jose Division.

Aug. 4, 1988.

John A. Skelton, Jr., Michael H. Porrazzo, Williams, Kelly, Polverari & Skelton, Redwood City, Cal., for plaintiff.

Raoul D. Kennedy, Stephen G. Schrey, Angus M. MacLeod, Crosby, Heafey, Roach & May, Oakland, Cal., for defendants.

## AMENDED ORDER GRANTING MOTION FOR SUMMARY ADJUDICATION

AGUILAR, District Judge.

## I. INTRODUCTION.

This case presents an important question of law the resolution of which may have implications beyond the scope of this lawsuit. In this motion, plaintiff Intel Corporation ("Intel") seeks an order requiring defendant The Hartford Accident and Indemnity Company ("Hartford") to reimburse it for expenses incurred under a "comprehensive general liability" insurance policy. The question presented is whether the policy involved covers costs incurred in connection with the cleanup of hazardous waste located on and beneath the insured's property. Although addressed in other jurisdictions, it is a question of first impression for appellate courts in the State of California. For reasons explained below, the Court concludes that the policy encompasses the claim made by Intel and that Hartford is liable under the terms of the policy for some, though perhaps not all, of the cleanup costs incurred by Intel.

## II. FACTUAL BACKGROUND.

Plaintiff Intel is an international manufacturer of semiconductors with its corporate headquarters in Santa Clara, California. During the late 1970s and early 1980s, Intel's production facilities were located in Santa Clara, Mountain View, and Livermore, California, as well as Aloha, Oregon and Chandler, Arizona. This motion relates to the Mountain View, California production facility located on Middlefield Road on property leased by Intel from an entity called Renault and Handley.

From 1968 through 1980, Intel conducted manufacturing operations on the Middlefield Road property leased from Renault and Handley. As part of its manufacturing processes at the Middlefield Road facility, Intel employed certain chemical solvents. These solvents contained one or more of the following elements or compounds: 1,1,1,–trichloroethane ("TCA"), trichloroethylene ("TCE"), trichlorobenzene ("TCB"), dichloroethylene ("DCE"), phenol, and xylene. Each of these solvents had been classified by the federal government as a "hazardous substance" within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and remain so classified under the 1986 amendments to CERCLA. 42 U.S.C. § 9601(14). *See also* 40 C.F.R. §§ 116.4A, 302.4 (July 1987).[1] Despite the extremely hazardous nature of these chemicals, Intel stored them in an unsecured underground storage tank. This tank apparently was intended only for temporary use, with the chemicals later transported to off-site locations for permanent disposal.

Sometime in 1980, Intel ceased production at the Middlefield Road manufacturing plant and moved its operations to a larger facility. Due to the existence of its lease with Renault and Handley which ran through 1984, Intel undertook to sublet the Mountain View property. Supposedly at the request of a prospective sublessee, Intel commissioned soil sampling and testing of the Mountain View property in September 1981. The test results showed that the

1. CERCLA was amended on October 17, 1986, by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). When appropriate, the Court will refer to the law as it existed at the time of the events in question, citing CERCLA and giving the statutory reference.

References to the law as it currently exists are indicated by the use of "SARA" followed by the statutory citation. Where there is no difference in the law, the statutory citation simply will be provided. All references to the Code of Federal Regulations correspond to the July 1987 edition.

site was contaminated by hazardous waste solvents both in the soil and in ground water percolating beneath the soil.

Upon learning of the contamination, Intel took several steps. The order and manner in which these steps were taken is not relevant here. It suffices to note that Intel contacted three environmental consulting firms to investigate the nature and extent of the problem, and notified several relevant government agencies with jurisdiction encompassing such problems. After the investigation revealed that the preliminary report was correct, i.e., that the soil adjacent to the solvent tank was contaminated and the ground water beneath the property had been despoiled, Intel began cleanup efforts. The tank was excavated, the adjoining soils removed, and the contamination of the ground water was addressed by the use of a pump-absorption filtration system.

Ultimately, in August 1985, Intel entered into a consent decree with the United States Environmental Protection Agency ("EPA") for purposes of the remediation of the site. *In The Matter of: Middlefield–Ellis–Whisman Area Mountain View, California (Fairchild Camera and Instrument Corp.; Intel Corp.; and Raytheon Corp.)* (hereafter, simply the "Consent Decree"). The Consent Decree is typical of the settlements achieved by EPA with "potentially responsible parties" ("PRPs") at CERCLA cleanup sites. EPA is more interested in achieving cleanup quickly than resolving the question of liability. Thus, Intel, as well as Fairchild and Raytheon (collectively, "respondents") accepted responsibility without admitting liability. *See Consent Decree* at 2.

Prior to achievement of the Consent Decree, on January 10, 1985, all three sites were listed on the California State Priority List by the California Department of Health Services ("DOHS") pursuant to California Health and Safety Code § 25356.

On April 30, 1985, the California Regional Water Quality Control Board ("RWQCB") issued separate waste discharge requirements to each of the respondents and certain other parties requiring them to undertake further investigation of ground water quality and to prepare and implement plans for interim containment and cleanup at their respective facilities. At that time, the California RWQCB referred the sites to EPA for action under CERCLA.

On May 15, 1985, respondents and others were notified by EPA of the agency's intent to conduct a remedial investigation and feasibility study ("RI/FS") at the site. Intel and its co-dumpers were invited to participate in formulating a plan whereby the private parties rather than the EPA would undertake such an investigation. Subsequently, the EPA asked for and received written work plan proposals from each of the PRPs.

Based on the submissions by the PRPs and the agreement of the California authorities, EPA and the respondents entered into the aforementioned Consent Decree. EPA made several findings in the Consent Decree which are relevant to this litigation. EPA stated that soil and ground water has been polluted with organic solvents including, but not limited to: TCE, TCA, TCB, DCE, xylene, and phenol. The sites containing the facilities of each of the respondents already had been proposed for inclusion on the National Priorities List.[2] *See* 40 C.F.R. Part 300, Appendix B, 49 Fed. Reg. 40320 (October 15, 1984). The hazards these sites pose to the public are underscored by the fact that the City of Mountain View has one public water supply well within one-half mile of the contaminated area and additional public water supply wells within one mile of the area. Consequently, EPA concluded that the "actual and threatened release of hazardous substances from facilities at the Site may present an imminent and substantial endan-

---

**2.** The National Priorities List is the EPA's list of the worst contaminated hazardous waste sites in the United States. The list is based on an assessment of several factors and the ultimate assignment of a numerical figures to each site evaluated to reflect scoring of the various

factors. *See* M. Worobec, *Toxic Substances Controls Primer* (2d ed. 1986) at 182; Note, "Superfund Settlements: The Failed Promise of the 1986 Amendments," 74 Virginia L.Rev. 123, 127 n. 25 (1988).

germent to the public health or welfare or the environment." *Consent Decree* at 6(G).

Acting pursuant to its authority under CERCLA, EPA certified that the work plan submitted by Intel, Fairchild, and Raytheon is consistent with the National Contingency Plan ("[W]ork to be performed by Respondents under this Consent Order ... is consistent with all applicable requirements of the National Contingency Plan"). *See* 42 U.S.C. § 9601(25). EPA further stated that "all costs reasonably incurred for such work are necessary costs of response." *Consent Decree* at 6(I). Intel and its corespondents were required to remit to the EPA $50,000 to cover EPA's costs for oversight and response costs in connection with the cleanup. Finally, the EPA stated:

> The actions and work required by this Consent Order are necessary to enable EPA or any other party to remove or remedy the existing or threatened conditions at the Site, and to further evaluate, prevent or minimize the release or migration or the threatened release or migration of hazardous substances to the environment and to protect the public health and welfare and the environment.

From April 1, 1976 through April 1, 1983, Intel owned a continuing insurance policy with defendant Hartford covering the Mountain View production facility. The "comprehensive general liability" insurance policy (hereafter, the "Policy") contained within its terms the following passage:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> Coverage A—bodily injury or
>
> Coverage B—property damage
>
> to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or prop-

erty damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Upon learning of its predicament, Intel notified Hartford in October 1981 of a claim for reimbursement for reasonable and necessary investigation and cleanup costs incurred by Intel in connection with the Mountain View facility. The basis for its claims was the above-mentioned portion of its policy and the portion of the policy which defined an "occurrence." [3] As discussed below, there is some dispute as to when the claim actually was lodged, but it is clear that Hartford denied the claim on May 19, 1982, because of "Exclusion K" which excluded coverage for damage to "property owned or occupied by or rented to the insured."

After Hartford's denial of coverage, the parties engaged in a protracted squabble regarding their respective positions. Unable to reason with the insurer and facing potentially serious liability, Intel filed suit in California Superior Court in the County of Santa Clara. On November 20, 1986, Hartford removed the case to federal court. The matter was assigned to Judge William A. Ingram of this Court. After entertaining a motion to remand, Judge Ingram dismissed the action without prejudice because of lack of derivative jurisdiction under the applicable removal statute and lack of diversity. *See Intel Corp. v. The Hartford Accident and Indemnity Co.,* 662 F.Supp. 1507 (N.D.Cal.1987).

On June 2, 1987, Intel refiled in California Superior Court in Santa Clara County. Once again, Hartford removed to this Court. This time, however, the case was assigned to the RPA docket. Intel did not

---

**3.** The trigger for invocation of policy coverage is the incident of an "occurrence." This term is defined as follows:

> "Occurrence" means an accident, including continuous or repeated exposure to condi-

tions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

make a motion to remand and for unknown reasons the case was not related to Judge Ingram's prior filing. Thus, the case remains as docketed and this Court must now address Intel's motion for summary adjudication.

## III. DISCUSSION.

### (A) *Introduction:*

The complaint contains a host of claims against Hartford including, but not limited to, fraud, deceit, intentional and negligent misrepresentation, breach of contract, breach of fiduciary duty, tortious breach of the implied covenant of good faith and fair dealing, breach of the insurer's statutory duties, civil conspiracy, and, of course, violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. In this motion, Intel seeks summary adjudication of the issue of the scope of the insurance policy. As stated by Intel, "[t]he sole issue presented in this Motion is whether insurance coverage exists under the policy for Intel's reasonable and necessary costs incurred in the investigation and clean-up (sic) of hazardous chemicals at its Mountain View facility in order to prevent or mitigate claims or possible claims of injury or damage to third parties."

### (B) *Is There A Case or Controversy?*

■ Before taking up the contract issues presented, the Court must address defendant's arguments surrounding the case or controversy requirement of Article III of the United States Constitution. The bulk of Hartford's opposition to this motion focuses on the technical issue of the proper filing of an insurance claim. Hartford insists that Intel has not established that it

actually has filed a claim with Hartford or that it has incurred costs for which Hartford is responsible. The argument is concisely stated as follows:

> Intel has not demonstrated that it ever made a specific claim for anything beyond some shapeless amalgam of "costs for investigation and clean-up [sic]," and has certainly not shown that it has spent even a dollar which might be arguably covered under the pertinent comprehensive general liability insurance policy.

It is true that Intel has not filed any receipts or proof of payment with this Court. Nor has Intel filed any proof of claim. But no such proof is necessary. Intel has made these accusations in its complaint, and Hartford has *admitted* them in its answer. To wit, in paragraph 22 of its answer, Hartford responds to Intel's assertion of having filed a claim and incurred costs in the following language:

> [Hartford] admits that on or about February 16, 1982, plaintiff notified Hartford of contamination at one of plaintiff's facilities on Middlefield Road in Mountain View, California, and admits that plaintiff has since made claims for reimbursement for investigation and cleanup costs at that site.

This admission satisfies the case or controversy requirement of Article III. Hartford's arguments now are akin to the proverbial sealing of the barn door after the bovines have gone to graze in the pasture. Moreover, Hartford's argument here, in light of its previous admission, borders on sanctionable conduct. To admit that an insured has made a claim and then later to deny that any claim exists smacks of bad faith.[4] There is a real dispute between the

---

**4.** In a motion for reconsideration that preceded the issuance of this amended order, Hartford asked the Court to delete the two sentences that precede this note. Defendant took the position that:

> The essence of Hartford's argument was that while Intel has made a "claim" (in the sense of a "demand") for payment of its cleanup costs, Intel never gave "written notice containing particulars," as required by Condition Four of the policy....

Hartford's *Reconsideration Brief* (May 16, 1988) at 19:22–25.

In other words, in retrospect Hartford's use of the phrase "plaintiff has since made claims for reimbursement" was really intended to mean that Intel "demanded" reimbursement but had never filed a claim.

This is a fascinating analysis. Hartford almost appears to believe that its responsibilities in this case arise from a linguistic game in which it writes the rules. Intel is entitled to rely upon Hartford's admissions and when Hartford admits that it received "claims," Hartford later cannot miraculously translate its admission into a recognition of "demands." What

parties. Intel has filed a claim and Hartford has denied it. The matter properly has been presented to the Court as a case for judicial resolution.

### (C) *By Its Terms Does the Insurance Policy Cover This Claim?*

The parties agree that the Policy covers claims made for damages to third parties. As quoted above, coverage includes claims made against Intel for bodily injury or property damage. Intel has made a claim against the Policy for coverage of damage presently and prospectively to third-party property, and prospectively for the threat of injury to third persons. In the face of apparent coverage, Hartford raises two provisions of the Policy as defenses to avoid coverage—Exclusion F and Exclusion K.

### (D) *Analysis of Exclusion F—The Pollution Exclusion:*

Hartford denies coverage on the basis of two exclusions. The first of these exclusions is Exclusion F which provides:

> This insurance policy does not apply ...
> (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

■ The construction of this exclusion and its application is an issue over which courts have differed. *See New Castle County v. Hartford Accident and Indemnity Co.*, 673 F.Supp. 1359, 1363 (D.Del. 1987) (listing cases and stating that "there is clearly a split of authority"); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co. of New York*, 218 N.J.Super. 516,

528 A.2d 76 (N.J.Super.App.Div.1987) (listing cases and noting "some degree of disarray"). However, this Court need not address the merits of this claimed exclusion because the Court concludes that Hartford has waived its right to invoke the exclusion.

The factual basis for the Court's conclusion is found in the history of the dispute over this claim by Intel against the Hartford Policy. Declaration testimony of Rossmore C. Robert, Division Supervisor in the Claims Department of Hartford Insurance, establishes that Hartford received notice of the claim no later than February 16, 1982. On March 31, 1982, a Hartford claims representative responded to the claim by referring Intel to certain provisions of the Policy. Specifically, Hartford asked Intel to "[p]lease review [the Policy]," while directing Intel's attention to "exclusions F, K1, and L, Broad Form Property Damage Endorsement form L3252–2[,] exclusion Y1 and Contractual Liability Insurance Coverage Part 3523–0 exclusions G and H." Hartford stated that "[i]t would appear [that] these exclusions may apply," but the claims representative went on to emphasize that "we will continue our investigation" and "we will contact you as soon as a decision regarding coverage is made." Thus, it is unequivocally clear that as of March 31, 1982, Hartford had made no decision on the applicability of the aforementioned exclusions; none of the at least six potential exclusions had been invoked or ruled out from Hartford's point-of-view.

On May 19, 1982, three months after the claim was filed and seven weeks after reporting that it continued to investigate the matter, Hartford informed Intel that it was denying the claim. Aside from the greeting and closing salutation and an introductory and concluding sentence on either side

---

makes this little twist fascinating, however, is that Hartford boldly states later in its brief that:
> [T]he distinction between a simple demand for money and a formal claim under the policy is a crucial one and the concepts should not be treated interchangeably.

*Reconsideration Brief* at 22 n. 13.
Hartford might also add as a footnote to this quote:
> "Hartford reserves the right itself to use the concepts interchangeably when expedient."

of the greeting and salutation, the entirety of the text of the letter is as follows:

> After a careful review of the facts of this loss and the terms of your policy #57 CM X0230, policy term, 4/1/81 through 4/1/82.·(sic) It has been determined that coverage will be afforded for bodily injury or property damage claims brought against Intel by the Silvas.
>
> There will be no coverage for any claims for damages, loss of rent, etc. to the facility at 365 Middlefield Rd., Mt. View, CA. Exclusion K form L 3503–1 would apply.

This letter unmistakably documents the fact that the *sole* basis for denial of Intel's claim was Exclusion K—which excludes coverage for damage to the insured's property as opposed to that of third parties. The pollution exclusion, Exclusion F, is not stated as a basis for denial of coverage, nor is the exclusion even mentioned. Similarly, in a letter from the supervisor of the Hartford claims division in San Jose, California, Nate Swainson, Hartford reiterated that the basis for its denial of coverage was Exclusion K. Again, no mention was made by Swainson of Exclusion F. Another letter in March 1986 also referenced Exclusion K but omitted any mention of Exclusion F.

In connection with this motion, Hartford submitted the declaration of Rossmore C. Robert, Hartford's Division Supervisor in ·the Claims Department. Mr. Robert stated that he was the custodian of the original claims file on Intel's policy. Mr. Robert stated that "[a]ll materials which are generated in connection with a 'claim' ... are kept in the 'claims file'." *Declaration of Rossmore C. Robert* at 2:20–21. This file contains not only records of contact by the insured to the insurer, but also "copies of all internal memoranda or correspondence from Hartford to its insured or other parties." *Id.* at 2:18–19.

Mr. Robert's declaration constituted a synopsis of the claims file of Hartford with respect to Intel's claim with the actual documents appended as exhibits. Robert's declaration and the claims file contain no mention of Exclusion F after the preliminary letter of March 31, 1982.

Notwithstanding the Robert declaration, the claims file, and Intel's assertion that "Hartford *for the very first time in this case,* has raised exclusion (f) as a policy defense, the 'sudden and accidental' provision [sic]," *Intel Reply Brief* at 9:22–24 (emphasis added), the parties have filed papers which contradict their own and each others' positions. In its complaint, Intel asserted the following:

> On or about November 19, 1982, and upon several separate occasions thereafter, both orally and in writing, Hartford notified Intel that it was denying coverage for Intel's claim arising out of the leakage at its Santa Clara III and Santa Clara Magnetics plants, as well as at other plants, based on Exclusion (f) in the policy, in that the loss was not sudden and accidental, the same exclusion relied upon by Hartford unsuccessfully in denying its insured's claim in the *Coastal Chemical* case, in addition to Exclusion (k) previously referred to herein.

Thus, although not explicitly stating so, Intel implies in paragraph XXIV of the complaint that Hartford had invoked Exclusion F as a basis for denial of coverage of November 19, 1982, and thereafter.

In its answer to the complaint, Hartford explicitly stated that it had told Intel that coverage was excluded under Exclusion F. At paragraph 24 in its answer, Hartford stated:

> 24. Hartford denies the allegations of paragraph 24, except admits that on or about November 19, 1982, Hartford advised plaintiff that there was no coverage available for damage to plaintiff's own property at its site on Middlefield Road in Mountain View, California, because of exclusion "f" in the policy.

Rather than inducing the parties to square each's own apparently contradictory statements, the Court will simply view the matter in the light most favorable to Hartford. In that light, Hartford may be supposed to have invoked the pollution exclusion on or about November 19, 1982. The

question presented, then, is whether after citing and relying upon one exclusion as the basis for denial of coverage, Hartford may later invoke an entirely different exclusion as an additional basis for denial of coverage?

Judge Patel of this Court confronted precisely this question in the case of *McLaughlin v. Connecticut General Life Ins. Co.*, 565 F.Supp. 434 (N.D.Cal.1983). After concluding that the California Supreme Court had not spoken on the subject, Judge Patel ruled:

> [T]his court concludes that the California Supreme Court would hold that an insurer waives its right to rely on defenses not specified in its denial [of coverage] which a reasonable investigation would have uncovered.

565 F.Supp. at 452.

Having retraced the research done by Judge Patel and examined California law since the decision in *McLaughlin,* this Court finds that it remains true that the California Supreme Court has not spoken on the subject. Furthermore, the Court finds that the holding in *McLaughlin* is both fair and a faithful extrapolation of the laws of California.

As the above discussion points out, and as has been highlighted in the development of the covenant of good faith and fair dealing in California courts within the past few years,[5] California places significant obligations on insurers in handling claims of insureds. For example, the California Supreme Court in *Egan v. Mutual of Omaha Insurance Co.*, 24 Cal.3d 809, 817, 169 Cal. Rptr. 691, 620 P.2d 141 (1979), *cert. denied,* 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980), held that an insurer may breach the implied-in-law covenant of good faith and fair dealing if it fails properly to investigate its insured's claim. *See also Hanson v. Prudential Ins. Co. of America,* 772 F.2d 580, 584 (9th Cir.1985) (citing *Egan* ), *modified on different grounds,* 783 F.2d 762. A natural concomitant of this ruling is that an insurer has a duty of candor to

explain or at least make reference to the bases for denial of policy coverage.

In this case, Hartford informed Intel of its reliance on Exclusion F at least six months after denying the claim because of Exclusion K. The fact that Hartford was aware of the potential availability of Exclusion F at the time it denied the claim is established by the fact that Hartford wrote the contract, and Hartford itself listed the exclusion in the letter of March 31, 1982 among the six exceptions that Hartford thought "may" be available. Furthermore, Hartford was fully aware of the nature of the risk. In the letter of November 1, 1982, from Nate Swainston to Intel, Swainston actually commended Intel for its cleanup operations. Swainston stated that "[w]hat has been established thus far is that there was a leakage at the Mountain View cite (sic) that resulted in some water and soil contamination of that cite (sic)." Possessing undisputed knowledge of the nature of the risk and the availability of Exclusion F to exclude that risk from coverage, Hartford had an obligation to Intel to inform it if Exclusion F was to be invoked.

This conclusion is buttressed by the fact that at least twenty other states have adopted laws imposing an obligation on insurers to state all the bases for their denial of coverage which they know or should have known at the time of the first denial. For a list of cases, see 16C Appleman, *Insurance Law and Practice* § 9260, at 393 (West 1981 & Supp.1987) (hereafter "*Appleman*"). The proposition, as stated by *Appleman* with abundant citations, is that once a specific ground of forfeiture or exclusion is offered to deny the claim, "all other grounds are waived." *Id.; see, e.g., Luria Bros. & Co. v. Alliance Assur. Co., Ltd.,* 780 F.2d 1082, 1090 (2d Cir.1986) (quoting *Appleman* and citing New York law). Hence, for example, the Ninth Circuit has concluded that:

> Under Oregon law when an insurer denies liability upon a specific ground, other grounds of forfeiture then within its knowledge are waived. "Good faith" re-

---

5. *See Seaman's Direct Buying Services, Inc. v. Standard Oil Co.,* 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984); *Wallis v. Superior Court,* 160 Cal.App.3d 1109, 207 Cal.Rptr. 123 (1984); *Elxsi v. Kukje America Corp.,* 672 F.Supp. 1294 (N.D.Cal.1987).

quires an insurer to apprise the insured "fully of its position, and, failing to do this ... [the insurer] is estopped from asserting any defense other than that brought to the notice of the plaintiff." *Dillingham Corp. v. Employers Mutual Liability Ins. Co. of Wisconsin*, 503 F.2d 1181, 1185 (9th Cir.1974), *quoting Ward v. Queen City Fire Ins. Co.*, 69 Or. 347, 138 P. 1067 (1914).[6]

■ The Ninth Circuit's analysis of Oregon law provides a sound basis for inferring this doctrine of waiver to California law,[7] but it also raises one issue respecting construction of the doctrine. *Dillingham* refers to both waiver and estoppel as if the two were interchangeable, when in fact there is a subtle but significant distinction between the two.[8] Waiver relates to one party's forfeiture of certain rights. For example, waiver of the right against self-incrimination (in the criminal context) or waiver of notice. Generally, it makes no difference whether the opposing party relied upon the waiver or not. The unilateral act is decisive.

**6.** Defendant points out that the Oregon Supreme Court recently reversed an Oregon appellate panel for misapplying the decision in *Ward. See ABCD Vision, Inc. v. Fireman's Fund Ins. Cos.*, 304 Or. 301, 744 P.2d 998, 1001 (1987). The law in Oregon is that "[e]stoppel cannot be invoked to expand insurance coverage or the scope of an insurance contract." *Id.* (citing cases); *see also Verex Assurance, Inc. v. John Hanson Savings and Loan*, 816 F.2d 1296, 1303 (9th Cir.1987) (citing cases). Defendant contends that the Ninth Circuit in *Dillingham* also misapplied *Ward* by finding insurance coverage where none existed on the basis of waiver. If this is so, the Ninth Circuit has refused to acknowledge the error, for in *Verex*, a case in which the court explicitly acknowledged that Oregon law does not permit the invocation of estoppel to expand insurance coverage beyond the scope of the contract, *Dillingham* is cited with approval. 816 F.2d at 1302 n. 6.

The Ninth Circuit's seemingly incompatible statements of Oregon law are explained by the fact that Oregon law itself is not free of confusion. For example, in *ABCD* the Oregon Supreme Court insisted on making a distinction between a finding of waiver (a) relating to an act of forfeiture (which may be waived if not asserted) and (b) concerning the applicability of exclusions to deny coverage (which may not be waived to expand the terms of coverage). The apparent contradiction of the Oregon high court's position is captured in the following passage:

[E]stoppel cannot be used by the insured to increase the insurer's risk beyond the terms of the policy, but timely disclosure of the reasons for denying a claim can estop the insurer from subsequently denying a claim on other grounds.

*ABCD*, 744 P.2d at 1002.

Resisting the temptation to pursue further this niche of Oregon law, an example from this case helps to reconcile the Oregon Supreme Court's position. Within the terms of the policy, the contamination of ground water is covered as a form of injury to the property of a third party. If the contamination of ground water was not third-party property damage, then nothing Hartford could do would make a difference under Oregon law, or California law. *See Hartford Fire Ins. Co. v. Spartan Realty Int'l*, 196 Cal. App.3d 1320, 1325, 242 Cal.Rptr. 462 (1987) ("the doctrine of waiver may not be used to reform a contract to create liability for a condition specifically excluded by the terms of the contract.").

Notwithstanding coverage under the terms of the policy, Hartford could avoid paying to remedy the contamination if it could establish that Exclusion F applied. *See* (insurer has duty to demonstrate applicability of exclusions). Under Oregon law, as stated in *Ward* and *ABCD* and reported by the Ninth Circuit in *Dillingham*, Hartford could waive or be estopped from exercising its right to assert Exclusion F if (as it did here) it denied the claims based on Exclusion K and only later added Exclusion F as a grounds for denial. Of course, if an estoppel theory was applied, Intel also would have to demonstrate reliance.

**7.** It is interesting to note that in creating the new tort of bad faith denial of the existence of contract in *Seaman's*, the California Supreme Court relied on Oregon precedent. In the crucial passage of *Seaman's* wherein the court created the new tort by analogy, the source of the analogy was the Oregon Supreme Court's decision in *Adams v. Crater Well Drilling, Inc.*, 276 Or. 789, 556 P.2d 679 (1976). *See Seaman's*, 36 Cal.3d at 769, 206 Cal.Rptr. 354, 686 P.2d 1158.

**8.** *See Ins. Co. of the West v. Haralambos Beverage Co.*, 195 Cal.App.3d 1308, 241 Cal.Rptr. 427, 433 n. 6 (1987), *modified on different grounds*, November 17, 1987. The court quoted the following passage from 30 Cal.Jur.3d, Estoppel and Waiver § 1, pp. 693–94 (footnotes omitted):

Although the terms 'waiver' and 'estoppel' are sometimes used indiscriminately, especially in the law of insurance, they are two distinct and different doctrines that rest on different legal principles. Strictly speaking, 'waiver' is used to designate the act, or the consequences of the act, of one side only, while 'estoppel' is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts.

In contrast to waiver, estoppel always involves some elements of reliance by the opposing party. The classic definition of equitable estoppel is provided in the Restatement 2d of Torts § 894 which requires some action or forbearance on the part of a third party.[9] In other words, estoppel is a bilateral activity which involves inquiry into the actual relationship of the parties. The question is whether California law would adopt a unilateral or bilateral focus, i.e., would the California Supreme Court require some element of reliance or prejudice on the part of the insured before foreclosing an insurer from raising a ground for denial of liability that was known or reasonably knowable but not raised at an earlier date.

This Court concludes that the California Supreme Court's approach would be to focus on the unilateral action of the insurer in failing to investigate and raise all proper defenses to the claim at the outset. This conclusion is rooted, first, in *Egan* and other cases emphasizing the insurer's duty to investigate. Once a claim is presented, this duty exists regardless of the posture of the insured. Second, the California Supreme Court's analysis of the implied covenant of good faith and fair dealing suggests that a great deal flows from the relationship between the parties. Both parties owe good faith obligations to the other. "Sandbagging," in this case bringing a defense that should have been known but was not raised earlier, would seem condemnable because it runs contrary to these good faith obligations.

The third and final reason for constructing the doctrine in terms of waiver rather than estoppel is that the waiver approach is already an important component of California insurance law. For example, under California law, an insurer may be held to have waived the terms of a policy if it defends an insured without reservation of its right. *Miller v. Elite Ins. Co.*, 100 Cal.App.3d 739, 754, 161 Cal.Rptr. 322 (1980); *Phoenix Ins. Co. v. U.S. Fire Ins. Co.*, 189 Cal.App.3d 1511, 1527–28 n. 15, 235 Cal.Rptr. 185 (1987) (citing *Miller*), *modified on different grounds*, 190 Cal. App.3d 825A, *rev. denied*, June 17, 1987.[10] *Miller* and the decisions following it are in accord with the application of a theory of waiver to defenses that are known and not raised by an insured. For this reason, and for all the reasons outlined above, the Court concludes that the California Supreme Court would hold "that an insurer *waives* its right to rely on defenses not specified in its denial which a reasonable investigation would have uncovered." *McLaughlin*, 465 F.Supp. at 452. (emphasis added)

Applying this law to the facts of this case yields the inescapable conclusion that Hartford has waived its right to raise Exclusion F as a defense in this lawsuit. Hartford's letters to its insured clearly establish that it was aware of the exclusion. It is equally clear that Exclusion F, although mentioned early on as a *potential* basis for denial of coverage, was never invoked by Hartford in denying Intel's claim. Some six months later, Hartford sought to raise the Exclusion F defense. This Court holds that Hartford cannot raise Exclusion F because it has waived the application of the exclusion.

#### (E) *Applicability of the Theory of Estoppel:*

The Court is aware that there are cases stating that estoppel is the proper approach

---

**9.** *See also Restatement 2d Torts* § 872 and *Restatement 2d Contracts* § 90 (promissory estoppel). A good generic description of equitable estoppel is provided in *Strong v. County of Santa Cruz*, 15 Cal.3d 720, 725, 125 Cal.Rptr. 896, 543 P.2d 264 (1975) (en banc). *Strong* lists the requisite elements as: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.

**10.** In *Miller*, the insurer defended the insured without reserving its rights based on possible non-coverage under a particular exclusion clause. Further, the insured's conduct created the impression that there was no coverage dispute. The court ruled that those two factors together established a waiver. *Id.*

to this issue. For example, in *Wright v. Newman*, 598 F.Supp. 1178 (W.D.Mo.1984), *aff'd*, 767 F.2d 460 (8th Cir.1985), the court stated that "under Missouri law the loss of an insurer's defense is a matter governed by the principles of estoppel, with an attendant requirement of *some* showing of prejudice to the insured." 598 F.Supp. at 1201.[11] The court in *Wright* went on to state that "I believe ... that this position indeed reflects the mainstream of thinking in American law." *Id.*

Although the court in *Wright* may be correct, the citations in the *Appleman* treatise on which the *Wright* court relied do not resolve the issue. *Appleman* provides references from approximately a dozen jurisdictions.[12] In contrast, the waiver rule described in *Appleman* was referenced in some twenty jurisdictions. The best that can be said is that the cases are split. Courts do often discuss the issue in terms of estoppel and, at times, use the term "estoppel" interchangeably with "waiver" as in *Dillingham, supra*, 503 F.2d 1181.[13] But this is not surprising given the facts of the cases. Where an insurer has "sandbagged" an insured to the obvious detriment of the insured, equity cries out for estoppel. At that point, the question of estoppel versus waiver is an irrelevant doctrinal distinction.[14]

In this case, involving a district court's educated assessment of what the California

Supreme Court would do, it is appropriate to attend to the doctrinal distinction. Accordingly, for purposes of clarity, this Court rules that under an estoppel theory, Intel has not put forth evidence of injurious reliance necessary to support invocation of estoppel. The mere passage of six months between the denial of coverage and the invocation of Exclusion F does not establish prejudice. Without some showing of injurious reliance, Intel cannot lay the foundation required to assert estoppel. Therefore, although the Court finds that the waiver theory is appropriate in this case, there is insufficient evidence to sustain the theory of estoppel. Nevertheless, for the reasons described above in the discussion of waiver, as a matter of law, Hartford may not raise Exclusion F as a defense in this lawsuit.

(F) *Exclusion K:*

Before addressing the parties' assertions relating to the interpretation of Exclusion K, it is necessary to review relevant California law concerning the construction of insurance contracts in general, and exclusions in particular.

(i) *California Law on Insurance Contracts:*

California has well-developed principles which inform and constrain the interpretation of insurance contracts. To begin with,

---

11. A similar holding is found in *Weintraub v. St. Paul Fire & Marine Ins. Co.*, 609 F.Supp. 273, 275 (E.D.Pa.1985).

12. 16C Appleman, *Insurance Law and Practice* § 9261, at 403–06.

13. Often, the interchangeability of the terms "waiver" and "estoppel" reflects the fact that an insured may lose the right to assert non-coverage because of either theory. Hence in *Ins. Co. of the West v. Haralambos Beverage Co.*, 241 Cal.Rptr. 427, the court set forth conflicting standards to determine whether the insured had lost its right to non-coverage. On the one hand, the court acknowledged that *Miller, supra*, holds that an insured's failure to reserve its rights may lead to waiver. On the other hand, the court quoted at length from a decision pre-dating *Miller* holding that the doctrine of estoppel is the basis for the potential loss of an insured's right of non-coverage in such situations (i.e., the insured must show reliance of some sort). *Val's Painting & Drywall, Inc. v. Allstate Ins. Co.*, 53

Cal.App.3d 576, 586–87, 126 Cal.Rptr. 267 (1975).

After explicitly noting the distinction between the doctrines of waiver and estoppel, the court in *Haralambos* simply deflated the clear conflict between the cases by implicitly ruling that an insurer could be held to coverage under either theory: "[A]n insurer who assumes the defense of a disputed claim can avoid waiving coverage defenses *and* avoid estoppel by providing a sufficient and timely reservation of rights." 241 Cal.Rptr. at 433 (emphasis added).

14. This is not to deny that courts have faced the issue and squarely favored the estoppel theory. Two cases from Missouri are cited by Appleman for precisely this type of preference. 16C Appleman, *Insurance Law and Practice* § 9261, at 406, citing *Macalco, Inc. v. Gulf Ins. Co.*, 550 S.W.2d 883 (Mo.App.1977); *Morris v. Reed*, 510 S.W.2d 234 (Mo.App.1974).

"an interpretation of [a] policy is a *legal* rather than a *factual* determination." *Congleton v. Nat'l Union Fire Ins. Co.,* 189 Cal.App.3d 51, 59, 234 Cal.Rptr. 218 (1987) (emphasis in original), *rev. denied,* March 25, 1987. Moreover, an insurance contract, like any other contract, is construed against the party who prepared the document. *Federal Leasing Consultants, Inc. v. Mitchell Lipsett Co.,* 85 Cal.App.3d Supp. 44, 48 (Super.App.Dept.1978). In other words, where contract terms are ambiguous they will be construed against the author of the document. *Id.* This is particularly true in the context of insurance contracts where California courts have made it a policy to give the benefit of any doubts to insureds. *See Admiralty Fund v. Peerless Ins. Co.,* 143 Cal.App.3d 379, 385, 191 Cal.Rptr. 753 (1983) (providing citations and discussion of cases and principles favoring insureds over insurers). Courts are admonished to consider each insurance contract with an eye toward achieving "its manifest object of securing indemnity to the insured for the losses to which the insurance relates." *Id., quoting Crane v. State Farm Fire & Casualty Co.,* 5 Cal.3d 112, 115, 95 Cal.Rptr. 513, 485 P.2d 1129 (1971); *Beaumont–Gribin–Von Dyl Management Co. v. California Union Ins. Co.,* 63 Cal.App.3d 617, 622, 134 Cal. Rptr. 25 (1976). Thus, "[e]xclusions are narrowly construed and uncertainties resolved in favor of the insured." *Nat'l Union Fire Ins. Co. v. Estate of Meyer,* 192 Cal.App.3d 866, 871, 237 Cal.Rptr. 632 (1987), *rev. denied,* August 20, 1987; *Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 807–08, 180 Cal.Rptr. 628, 640 P.2d 764 (1982) ("Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured ..., exclusionary clauses are interpreted narrowly against the insurer...."); *see, e.g., Silberg v. California Life Ins. Co.,* 11 Cal. 3d 452, 464–66, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974) (interpreting ambiguous policy provision against the insurer).

With these principles in mind, the Court now turns to an analysis of Exclusion K.

(ii) *Introduction to Analysis of Exclusion K:*

The relevant text of Exclusion K is as follows:

This insurance does not apply ...

(k) to property damage (1) to property owned or occupied by or rented to the insured. . . .

█ The Court must conclude that given the facts of this case, Exclusion K does not apply. Clearly, there is property damage to the land leased by Intel, but that is not the sole damage. The water beneath the subject property has been polluted and lives and property nearby have been placed in peril. These facts are borne out in the "Administrative Order On Consent" (hereafter "Consent Decree") entered into by the EPA, Intel and two other polluters on August 15, 1985.

(iii) *The Consent Decree and Relevant Background:*

Before discussing the content of the Consent Decree, several background facts are noteworthy. The EPA's practice in administering Superfund has been to encourage settlement and private cleanup wherever possible.[15] When conducting its initial assessment of sites included on the National Priority List ("NPL"), EPA's seeks to identify PRPs and to determine whether public monies must be spent to address the problem. If solvent PRPs are identified, EPA almost invariably will attempt to secure their cooperation.[16] In particular, EPA encourages PRPs to perform, or at least participate in, the execution of a remedial investigation ("RI") and the subsequent ("FS"). In the RI, the extent of the environmental degradation is assessed. The goal is to evaluate the scope and severity of the threat to the public and the necessity

---

**15.** See generally, Note, "Superfund Settlements: The Failed Promise of the 1986 Amendments," 74 Virginia L.Rev. 123 (1988)

**16.** EPA estimates that of the anticipated 22,000 sites that eventually will be targeted for cleanup, only 2,000 sites will be cleaned up using Superfund monies. *See* M. Worobec, *Toxic Substances Controls Primer* at 182.

of immediate cleanup. In the FS, EPA examines all potential modes of removing the public threat and detoxification of the property and underground water.

In view of their joint and several liability for the entirety of an cleanup expenses, PRPs usually will seek to participate in the RI as well as the FS. For those PRPs who are financially able, often the best course is for them actually to conduct the RI/FS. In that way, PRPs are not only fully informed of their potential liability, but also are able to control the FS process of selecting the appropriate cleanup method and technologies. The consequence is that PRPs may be able to keep cleanup costs to a minimum by urging the adoption of the least-cost alternatives.

In this case, the EPA investigated the site, identified three PRPs and "invited" them to undertake the RI/FS themselves. *See Consent Decree* at 5. The Consent Decree embodies the respondents agreement to take remedial action pursuant to the specifications articulated by EPA. Several findings in the Consent Decree are relevant to the applicability of Exclusion K.

First, EPA's initial investigation disclosed soil and ground water contamination. Several biological harmful organic solvents were discovered lurking in and beneath the site including TCE, TCA, xylene, TCB, phenol, and DCE.

Second, EPA determined that the actual or threatened release of those substances from the site may present "an imminent and substantial endangerment to the public health or welfare of the environment." *Consent Decree* at 6.

Third, in support of its finding of endangerment to the public, EPA found that the site was within one-half mile of one public water supply well and within one mile of additional wells. Furthermore, private wells exist "at or near" the site. *Consent Decree* at 4.

Fourth, EPA concluded that the cleanup effort of which Intel plays a part is "necessary" to remove the harm and threat of harm, to "further evaluate, prevent or minimize the release or migration or the threatened release or migration of hazard-

ous substances", and *"to protect the public health and welfare and the environment."* *Consent Decree* at 7 (emphasis added).

Fifth, EPA also concluded that all activities performed pursuant to the Consent Decree "are necessary costs of response," *Consent Decree* at 6, and are consistent with the NCP, the blueprint for Congress' assault on hazardous waste. All costs incurred are "apportionable expenses of response and implementation."

Sixth, the parties were required to pay $50,000 into the Hazardous Substance Response Trust to cover EPA's oversight and response costs for the site.

Seventh, the Consent Decree contains joint and several penalty provisions whereby the respondents must pay the EPA as much as $5,000 per week for delays or shortcomings in the RI/FS process.

The sum and substance of the Consent Decree is that Intel, along with its co-polluters, must bear the expense of investigating and remedying damage and potential damage to the property itself, the underground water, adjoining property, and the public. Under California Water Code § 102 (West 1971 & 1988 Supp.), "[a]ll water within the State is the property of the people of the State." While individuals may acquire a right to use water, *id.*, no one has a right to pollute or otherwise damage the quality of the State's water. This is codified in California Water Code § 12922 which declares that the people of the State of California "have a primary interest in the correction and prevention of irreparable damage to, or impaired use of, the ground water basins of this State." These laws are enforced through penalty provisions under California law including California Water Code §§ 13300–13755. Criminal penalties may be imposed in certain circumstances. See California Water Code § 13387. Thus by polluting the ground water, Intel has damaged the property of all Californians—third-party damage of such a serious nature that it could warrant criminal prosecution in certain circumstances.

Although the Court's conclusion that ground water contamination is damage to third parties is sufficient to eliminate Exclusion K, other damage to third parties is also present. The EPA's assessment of Intel's property is tantamount to a governmental finding that the land is a public nuisance. Indeed, by some definitions the property is more than a mere nuisance [17] for it presents "an imminent and substantial endangerment to the public health or welfare or the environment." *Consent Decree* at 6. The costs incurred by Intel to abate this public danger must fall outside the ambit of Exclusion K. Moreover, Hartford's concern that Intel is spending money merely to repair its own former leasehold property is obviated by the Consent Decree's express finding that all costs incurred in connection with the cleanup "are necessary costs of response," i.e., they are necessary to evaluate, prevent or minimize the migration or release or threatened migration and release of hazardous substances and are necessary "to protect the public health and welfare and the environment." *Consent Decree* at 7. Under such circumstances, it is clear that Intel's response costs are not encompassed within Exclusion K.

It is worth emphasizing in this connection that Intel's actions are not taken merely to restore the property of its lessor. As a PRP, Intel faces joint and several liability for all of the consequences of its contamination. Although Intel has consented to begin the cleanup and to conduct the RI/FS (along with Raytheon and Fairchild), the earlier discussion highlights the fact that Intel will have to bear the costs of cleanup. By volunteering to participate in the cleanup operation, PRPs are able to mitigate their liability by keeping response costs down. Regardless of consent, the truth is that these PRPs are marked for liability to the public and they are answerable to the EPA—as evinced by the penalty provisions of the Consent Decree. *See Consent Decree* at 15. Thus, it would be disingenuous and misleading for Hartford to suggest that Intel's acts involve solely the cleanup of damage to the leased property. The EPA's involvement serves to underscore the public nature of the damage.

### (iv) Case Law on the Subject:

The parties agree that there is no, or virtually no, California case law addressing the issue presented here: whether Exclusion K can be applied to bar Intel's claim for coverage under its comprehensive general liability policy. Hartford has supplied one recent case relating to the subject, a superior court decision from Los Angeles County, *Protective Nat'l Ins. Co. of Omaha v. Union Oil Co.,* slip op. No. C514 463 (November 24, 1987). The case involves an attempt by Union Oil to receive reimbursement for investigative, cleanup and response costs incurred in connection with a petroleum processing site in the State of Washington. The policy provided coverage for loss resulting from "property damage." The Court concluded that reimbursement for response costs—including investigation and cleanup costs—"does not constitute 'property damage' within the meaning of the Insurer's policies." *Union Oil* at 3–4.

In assessing the holding of *Union Oil,* this Court must begin from the premise that although the California Superior Courts are "courts of record," *California Constitution* art. 6, § 1, their decisions are not dispositive in reflecting the status of California law. Whatever guidance to be derived from the *Union Oil* decision must be from its logic. Unfortunately, the opinion offers little reasoning to support its conclusion. Instead, the opinion merely cites the holdings in two opinions from the

**17.** *Black's Law Dictionary* (5th ed.) defines "nuisance" as "that activity which arises from unreasonable, unwarranted or unlawful use by a person of his own property, working obstruction or injury to right[s] of another, or to the public, and producing such material annoyance, inconvenience and discomfort that law will *presume* resulting damage." (emphasis added) In this case, the law need not "presume" damage; EPA already has concluded that damage has occurred. For a discussion of California law of nuisance, see generally 47 Cal.Jur.3d 193 ("Nuisances"). The general statutory laws regarding nuisances can be found in the California Civil Code § 3479–94.

United States Court of Appeals for the Fourth Circuit (which will be discussed below). Hence, although *Union Oil* is a decision rendered by a California court, it offers nothing in the way of independent analysis or an evaluation of the competing approaches to the issue.

With no California appellate precedent speaking directly to the issue, this Court has the task of determining what course the California Supreme Court would take if presented with this issue.[18] As stated above, the Court concludes that California statutory law mandates a finding that contamination of ground water constitutes injury to third-party property. Furthermore, after examining decisions on this issue handed down by state and federal courts around the country, the Court finds that the best analyses support the Court's conclusion that Exclusion K literally does not apply in this case.

In cases applying state law that, like California, recognizes public ownership of all underground water, several courts have ruled that contamination to ground water is not excluded from coverage by provisions like Exclusion K in this case.

In *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188 (9th Cir. 1986), the Court addressed the issue whether water is "tangible property" for purposes of an insurance policy's definition of "property damage." The court applied Oregon law and noted first that in Oregon "all water in the state belongs to the public." 796 F.2d at 1193. Second, the court observed that Oregon prohibits the discharge of pollutants into the water and provides a statutory vehicle to collect damages for illegal discharges. *Id.* However, because the Oregon Supreme Court had not spoken on the subject, the panel was obligated to anticipate the position that the Oregon court would adopt if given the opportunity. After examining cases from other jurisdictions, the court stated that it agreed with the district court "that the

'reasonable, enlightened view' that the Oregon Supreme Court would adopt would be that discharge of pollution into water causes damage to tangible property." *Id.* at 1194.

Another case deciding the issue in a similar vein is *United States Aviex Co. v. The Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838 (1983). The court examined an exclusion like "K" in this case and rejected its application. Under Michigan law, ground water does not belong to the landholder above the water. Hence damage to the ground water is damage to a third party and is not excluded from coverage. *See also Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 662 F.Supp. 71 (E.D.Mich. 1987) (following *Aviex* and applying Michigan law).

A similar conclusion was reached by the court in *Upjohn Co. v. New Hampshire Ins. Co.*, slip op. No. 85–288651–CK (Mich. C.C. January 5, 1987). In *Upjohn*, the insured had released 15,000 gallons of distillate fluids into the soil of Puerto Rico. Ground water contamination ensued. Under Puerto Rican law, ground water is a public resource. Following *Aviex*, the court in *Upjohn* determined that contamination of ground water could not be excluded from coverage because it is not property of the insured. The court concluded that "the damage caused by the spill was damage to the property of third persons notwithstanding the fact that the spill occurred on and most of the spill was removed from Upjohn's property." *Id.* at 10.

The law of California is analogous to the laws of Oregon, Michigan, and Puerto Rico in that underground water is a public resource. Contamination of that resource constitutes a palpable and tangible injury to the welfare of the entire State which for purposes of Intel's policy can be seen as a monolithic third party. Accordingly, the Court holds that the California Supreme Court would hold that damage to underground water is damage to tangible proper-

---

**18.** As stated by the Ninth Circuit, "[o]ur obligation in such circumstances is to apply the law as we believe the state court would apply it." *Port of Portland v. Water Quality Ins. Syndicate,*

796 F.2d 1188, 1194 (9th Cir.1986), *citing Ins. Co. of North America v. Howard,* 679 F.2d 147, 149 (9th Cir.1982).

ty of a third party within the terms of a comprehensive general liability policy. Hence, Exclusion K is no bar to coverage in this case.

### (v) *Does Cleanup of Contamination Constitute "Damages" Within the Terms of the Policy?*

There is an analytical step between injury to the property of a third party (California's water) and payment of damages. The terms of the policy provide that Hartford "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages...." While Intel indubitably has injured the property of a third party, can cleanup, investigation, and mitigation costs be considered a form of "damages" compensable under the policy? This raises a disputed theoretical problem and brings the discussion back to the two cases cited and relied upon by the California Superior Court in *Union Oil: The Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348 (4th Cir 1987), *cert. denied*, ―― U.S. ――, 108 S.Ct. 703, 98 L.Ed.2d 654, and *Mraz v. Canadian Universal Ins. Co., Ltd.*, 804 F.2d 1325 (4th Cir 1986).

In *Mraz*, plaintiff insured sought to recover costs owed to the United States for a cleanup of hazardous waste executed pursuant to § 107 of CERCLA. 42 U.S.C. § 9607(a)(4). The court concluded that response costs were not covered within the scope of the policy's comprehension of "property damage." The court's conclusion was grounded on CERCLA's distinction between property damage and response. The court ruled that response costs are "economic loss" which may be incurred independently of property damage which the policy defined as "injury to or destruction of tangible property." 804 F.2d at 1329. Thus, the court ruled that response costs were not "damages" within the meaning of the policy.

In *Maryland Casualty*, the Fourth Circuit again examined the issue of the meaning of "damages" in the context of a comprehensive general liability policy. Maryland Casualty sought a declaratory judgment concerning its liability to its insured, Armco, Inc., for reimbursement costs demanded by the U.S. in connection with the cleanup of a hazardous waste site in Missouri. The court began its analysis from the premise that: " '[d]amages,' as distinguished from claims for injunctive or restitutionary relief, includes 'only payments to third persons when those persons have a legal claim for damages....' " 822 F.2d at 1352, *quoting Aetna Casualty and Surety Co. v. Hanna*, 224 F.2d 499, 503 (5th Cir 1955). It followed from this, according to the court, that "damages" should be "construed in consonance with its 'accepted technical meaning in the law.' " 822 F.2d at 1352, *quoting Hanna*, 224 F.2d at 503. Utilizing this approach, the court concluded that expenditures which result from compliance "with the directives of regulatory agencies" are not damages within the technical meaning of the word. 822 F.2d at 1352. Rejecting two appellate decisions finding coverage on similar facts,[19] the court asserted its determination not "to extend the obligations of insurance carriers beyond the well-illumined area of tangible injury and into the murky and boundless realm of injury prevention." 822 F.2d at 1354.

*Mraz* and *Maryland Casualty* offer some guidance to the question of whether there are compensable "damages" in this case. Because it believes that response costs are not "damages", the Fourth Circuit clearly would not rule for *Intel* here. However, these decisions present several problems. For example, *Mraz* bases its analysis of the definition of property damage on a federal statute, CERCLA, rather than the laws of the state in question. Mr. Mraz was in federal court on the basis of diversity of citizenship, *see* 804 F.2d at 1326–27, and it is well established that fed-

---

**19.** Those two decisions are *Aviex, supra,* 125 Mich.App. 579, 336 N.W.2d 838 (1983), and *Continental Insurance Co., v. Northeastern Pharmaceutical & Chemical Co.*, 811 F.2d 1180 (8th Cir.1985), *reh. granted*, 815 F.2d 51. The *Conti-* *nental Insurance* decision was subsequently reversed by a sharply divided vote of the Eighth Circuit *en banc.* 842 F.2d 977 (1988). See *infra* for discussion of the *en banc* decision.

eral court hearing cases based upon diversity of citizenship apply the laws of the forum state. *Erie Railroad v. Tompkins*, 304 U.S. 64, 78–79, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938). Yet if one examines the court's opinion, there is not a single reference to Maryland law nor an explanation of whether Maryland law is silent on the issues presented.[20] Most important, on the question of whether response costs are distinguishable from property damage, the court relies on the distinctions inhering in CERCLA—a federal statute—rather than examining the relevant Maryland precedent. To describe response costs as "economic loss" does not answer the question whether it is a loss which is compensable as a form of "damages" under the law of the relevant state.

Although the Fourth Circuit in *Maryland Casualty* properly does elect and attempt to apply the law of the forum state, the court's decision is no less flawed. It is not clear why the court elected a definition of "damages" drawn from a thirty-year old case in another circuit.[21] Apparently, the Fourth Circuit sought the narrowest available definition to constrict the scope of insurers' liabilities. Whatever the reason, the panel stated that the *Hanna* decision reflects Maryland law. 822 F.2d at 1352, *citing Haines v. St. Paul Fire and Marine Ins. Co.*, 428 F.Supp. 435 (D.Md.1977). However, an examination of *Haines* reveals that it, like *Mraz*, does not rely upon Maryland law. As noted in *Maryland Casualty*, the *Haines* Court ruled that a claim for restitution of profits made in violation of the federal securities laws was an action for "traditional equitable relief and cannot be considered damages within the policy coverage." 428 F.Supp. at 441.

The logic of *Haines* derived from the Supreme Court's decision in *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), which dealt with the right to jury trials in Title VIII actions. The Court distinguished Title VIII actions from those arising under Title VII and noted that the Title VII provision for "back pay" awards is committed to the discretion of the trial judge and is "equitable" in nature. 415 U.S. at 196–97, 94 S.Ct. at 1009–10. Similarly, the court in *Haines* concluded that restitutionary character of the SEC's prosecution was equitable in nature and that the disgorgement of illegal profits is not "damages" in the traditional sense.

With all due respect to the court in *Haines*, this Court concludes that the proper source to determine the definition of damages in a diversity case is the law of the forum state. *Haines* fails to respect this fact, as does the Fourth Circuit in *Mraz*.[22] Although the Fourth Circuit in *Maryland Casualty* does acknowledge the need to consult state (Maryland) law to decide the issue, the court failed to do so except for a citation to *Haines*.

Before examining California law, a brief survey of other states' treatment of the issue is instructive. For example, in a case cited earlier, a Michigan appellate court determined that "damages" under Michigan law includes monies spent to reimburse the government for costs incurred in investigating and cleaning up chemical contamination of underground water. *United States Aviex Company v. Travelers Insurance Company*, 125 Mich.App. 579, 336 N.W.2d 838 (1983). The insurance policy provisions in *Aviex* were virtually identical to those in this case. The court squarely addressed the issue of damages and reject-

**20.** For example, the Court selects cases from seven jurisdictions (four state court and three federal court decisions) to arrive at its holding that "in hazardous waste burial cases ... the occurrence is judged by the time at which the leakage and damage are first discovered." 822 F.2d at 1328. It is difficult to fathom how the State of Maryland could offer no case law on the meaning of "occurrence" in the insurance context, yet the Court makes not a single reference to Maryland decisions or statutes.

**21.** The definition itself also is lacking in that it is a tautology defining damages as payment to a person who "has a legal claim for damages." 822 F.2d at 1352.

**22.** As in *Mraz*, the court in *Haines* observed that jurisdiction was based on diversity of citizenship and the issue presented was "the construction of an insurance contract." 428 F.Supp. at 436–37.

ed the argument that investigation and cleanup costs were not "property damages" within the terms of the policy. Noting three decision from other jurisdictions finding no coverage on similar facts,[23] the court in *Aviex* rejected their reasoning as interpreting "damages" "too narrowly". The court observed that under Michigan law, the state's interest in natural resources would allow the State Attorney General to sue the insured for contamination of subterranean water. If such a suit were prosecuted, the insurer undeniably would be obligated to cover any damages awarded—including cleanup costs. The court then stated:

> "It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of cleanup itself and then suing plaintiff to recover those costs. The damage to the natural resources is simply measured in the cost to restore the water to its original state." [citations omitted] [no page-Lexis]

**23.** The three opinions are *Hanna, supra,* 224 F.2d 499 (5th Cir.1955); *Ladd Construction Co. v. Ins. Co. of North America,* 73 Ill.App.3d 43, 29 Ill.Dec. 305, 391 N.E.2d 568 (1979); and *Desrochers v. New York Casualty Co.,* 99 N.H. 129, 106 A.2d 196 (1954). The *Hanna* opinion formed the intellectual premise of the Fourth Circuit's decision in *Maryland Casualty.*

**24.** The majority *en banc* in *Continental Insurance* relies almost exclusively on the Fourth Circuit's opinion in *Maryland Casualty.* Like the panel in *Maryland Casualty,* the majority also invoked *Aetna Casualty & Surety Co. v. Hanna,* 224 F.2d 499 (5th Cir.1955). However, as noted by the dissent in *Continental Insurance, Hanna* is of "doubtful applicability." Another case cited by the majority in *Continental Insurance* supporting denial of coverage is *Desrochers v. New York Casualty Co.,* 99 N.H. 129, 106 A.2d 196 (ruling that claims for equitable relief are not claims for damages under insurance law). Three other cases cited as examples of decisions denying insurance coverage "for costs of complying with an injunction even in cases where the suits could have been brought for damages" are: *Maryland Casualty Co. v. Armco, Inc.,* 643 F.Supp. 430 (D.Md.1986), *aff'd,* 822 F.2d 1348; *Garden Sanctuary, Inc. v. Ins. Co. of North America,* 292 So.2d 75 (Fla.Ct.App.1974); *Ladd Construction Co. v. Ins. Co. of North America,* 73

*Aviex* is an important case on the topic of damage because it focuses the issue. A recent *en banc* opinion of the United States Court of Appeals for the Eighth Circuit further crystalizes the issue. In *Continental Insurance Co., v. Northeastern Pharmaceutical & Chemical Co.,* 842 F.2d 977 (1988), the Eighth Circuit *en banc* addressed the issue whether environmental cleanup costs are "damages" within the scope of a comprehensive general liability ("CGL") policy. By a 5–3 vote, the court held that cleanup costs are not "damages" within the meaning of CGL policies. This decision reversed a prior panel decision published at 811 F.2d 1180 (8th Cir.1987).

Several valuable points can be distilled from the sharply divided opinions of the court. First, both sides agreed that as a diversity case in federal court, the law of the forum state applied, i.e., the law of Missouri. Second, both sides recognize that the "[c]ase law on this issue is sharply divided." However, the division of cases on this subject is "sharp" only in respect to the contrast between the two positions. The clear bulk of authority has held that cleanup costs are damages within the scope of CGL policy coverage.[24] Yet, as implicit-

Ill.App.3d 43, 29 Ill.Dec. 305, 391 N.E.2d 568 (1979); *see also City of Thief River Falls v. United Fire & Casualty Co.,* 336 N.W.2d 274 (Minn.1983) (damages does not include compliance with writs of mandamus).

Contrary authority finding coverage for cleanup costs include: *Aviex, supra; Fireman's Fund Ins. Co. v. Ex–Cell–O Corp.,* 662 F.Supp. 71 (E.D. Mich. 1987) (following *Aviex* and applying Michigan law); *New Castle County v. Hartford Accident and Indemnity Co.,* 673 F.Supp. 1359 (D.Del.1987) (applying Delaware law to same Hartford policy); *Broadwell Realty Services, Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 528 A.2d 76 (Super.App.Div.1987); *Port of Portland v. Water Quality Ins. Syndicate,* 796 F.2d 1188 (9th Cir.1986) (suggesting that Oregon Supreme Court would follow "reasonable, enlightened view" that discharge of pollution into water causes damage to tangible property and "hence cleanup costs are recoverable under a property damage liability clause."); *Landsco, Inc. v. Dept. of Envmt'l Protection,* 138 N.J.Super. 275, 350 A.2d 520 (Ch.Div.1976), *aff'd,* 145 N.J.Super. 433, 368 A.2d 363 (N.J.Super.App. Div.1976), *cert. den'd,* 73 N.J. 57, 372 A.2d 322 (1977); *Kutsher's Country Club Corp. v. Lincoln Ins. Co.,* 119 Misc.2d 889, 465 N.Y.S.2d 136 (Sup. Ct.1983); *Consolidated Rail Corp. v. Certain Underwriters at Lloyds,* Civ.A. No. 84–2609 (E.D.Pa.

ly noted by the dissent, the fact that the law of the state applies is dispositive; each state's own law may provide its own answer to this question.

(vi) *Assessment of Relevant California Law:*

 Although no California appellate court has decided the issue, there is California law to answer the question of whether cleanup and investigation costs are "damages" within the meaning of a CGL policy. Indeed, there is a statute speaking to the issue, California Civil Code § 3281, which provides:

> Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages.

The Court notes that § 3281 speaks to "damages" which technically is not identical to "damage." "Damage" denotes "injury to the person or property of the plaintiff as the result of a wrongful act or omission on the part of the defendant," 23 Cal.Jur.3d § 2 at 12 (1975), whereas "damages" is the compensation awarded to one who suffers "damage." Section 3281 essentially incorporates the former to arrive at a definition of the latter so that the two are inextricably intertwined.[25] This is consistent with time-tested California case law. *See Wainscott v. Occidental Bldg. and Loan Association*, 98 Cal. 253, 255, 33 P. 88 (1893).[26]

Applying California law, it is clear that damage has occurred for which compensation in the form of damages would be appropriate. The State and People of California have suffered a detriment from the unlawful acts or omissions of Intel and are entitled to damages as a result. The detriment, which is defined as a "loss or harm suffered in person or property," California Civil Code § 3282, is not yet fully determined, but at this point there is established detriment to California's ground water through contamination, and a serious health threat to the people of the state. As noted earlier, the contamination of California's environment, in particular the water, is illegal. *See, e.g.*, California Water Code § 13387. In entering into the Consent Decree along with Intel and EPA, California's Regional Water Quality Control Board and Department of Health Services already have demanded and received the payment of $50,000 in money compensation from Intel and its co-polluters. Further compensation will be paid in kind, for instead of EPA and the State of California performing the investigation and cleanup and demanding payment of "compensation therefor in money," California Civil Code § 3281, Intel and its peers will conduct the work under the conditions imposed by the government, which include strict government supervision. Thus, under California law, damages have been and are being paid by Intel.

This analysis is consistent with the requirement in California that insurance contracts be read "in the light of the reason-

June 5, 1986) (unreported decision available on Westlaw at 1986 WL 6547); *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 654 F.Supp. 1334 (D.D.C.1986); *Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394 (D.N.J.1987) ("costs of clean-up and closure [of landfill] do constitute 'damages' under the CGL policies at issue"); *Centennial Ins. Co. v. Lumbermens Mutual Casualty Co.*, 677 F.Supp. 342 (E.D.Pa.1987), reported in 1987 *Haz.W.Lit.Rptr.* at 11,933 (December 21, 1987) (quoting and following *Aviex* reasoning); *Solvents Recovery Service v. Midland Ins. Co.*, No. L–25610–83 (N.J.Super.Ct. November 17, 1987).

25. The word "detriment" is used in § 3281. The statutory definition of "detriment" is "loss or harm suffered in person or property." Califor-

nia Civil Code § 3282. Hence, "detriment" is synonymous with "damage" under California law.

26. "Damage" is defined to be "loss, injury, or deterioration, caused by the negligence, design, or accident of one person to another, in respect to the latter's person or property." *Black's Law Dictionary* (5th ed.). The plural of the word, "damages," signifies a "compensation in money for a loss or damage." Although the California Supreme Court in *Wainscott* relied upon the first edition of *Black's Law Dictionary* (1891 ed.), the recent fifth edition contains that exact same definition augmented by the explanation: "By damage we understand every loss or diminution of what is [one]'s own, occasioned by the fault of another."

able and normal expectations of the parties as to the extent of the coverage." *Globe Indemnity Co. v. State of California,* 43 Cal.App.3d 745, 751, 118 Cal.Rptr. 75 (1974); *Hanson v. Prudential Ins. Co. of America,* 783 F.2d 762, 765 (9th Cir.1985), *citing Reserve Insurance,* 30 Cal.3d at 809, 180 Cal.Rptr. 628, 640 P.2d 164, and *McLaughlin,* 565 F.Supp. at 441 (N.D.Cal. 1983). At the time this contract was negotiated, neither party anticipated a claim of this sort. What the parties did contemplate, as expressed by the clear terms of the policy, is that if Intel became legally obligated to pay damages to a third party because of bodily injury or property damage inflicted by Intel, Hartford would compensate Intel.[27] Intel legitimately could and does expect Hartford to make such compensation as long as Intel is legally obligated to pay damages to a third party. Intel as a PRP is legally obligated to pay all costs associated with the cleanup of the Middlefield Road property. The fact that his obligation is not in the form of a civil judgment or criminal fine does not alter the fundamental nature of Intel's obligation. As alluded to above, Intel's participation in the "consent" decree is a polite way in which the EPA forebears the use of its legal authority to compel cleanup.[28] As an occupant of the contaminated land and the acknowledged generator of the toxins, Intel is without question legally obligated (i.e.

liable) for all costs of cleanup and is covered by the clear terms of the policy.

Mitigation of damages is a well-established fixture in California law.[29] For example, a party injured by a breach of contract is required to take all reasonable measures to mitigate his own loss and thereby minimize the liability of the breaching party. *See* 1 Witkin, *Summary of California Law* § 857 (9th ed. 1987) and cases cited therein. A lessor in California seeking damages from a breaching tenant has a statutory duty to act "reasonably" and in "good-faith" to mitigate his damages. *See* California Civil Code § 1951.2(c)(2) and accompanying Legislative Committee Comment from the California State Assembly. A similar principle is recognized in tort law insofar as a tortfeasor is not responsible for damages which are attributable to the unreasonable or imprudent actions of the plaintiff. *See* Civil Code § 1714(a). This principle has been embraced in its purest form by the California Supreme Court in its rejection of the doctrine of contributory negligence in favor of the doctrine of "pure" comparative negligence. *See Li v. Yellow Cab Co.,* 13 Cal.3d 804, 828–29, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975). Although the doctrine was judicially adopted, the legislature has not promulgated change and it thus remains the law of the state. *See, e.g., Pool v. City of Oakland,* 42 Cal.

**27.** *Cf. Atlantic Nat'l Ins. Co. v. Armstrong,* 65 Cal.2d 100, 112, 52 Cal.Rptr. 569, 416 P.2d 801 (1966) ("It cannot be doubted that [the holder of an automobile insurance policy] intended to relieve himself of liability which might arise out of the operation of the automobile, for surely he did not enter into the contract solely for the benefit of strangers who might be injured.")

**28.** It is economical and time efficient for EPA to achieve a Consent Degree with PRPs rather than enforcing cleanup through litigation. Clearly, EPA has the statutory authority to compel PRPs to clean up now and dispute liability later, see CERCLA § 106, 42 U.S.C. § 9606, or EPA could clean up the site itself and seek compensation. CERCLA § 107, 42 U.S.C. § 9607. In this case as in most others, EPA has opted for a third statutory route of achieving cleanup by settlement, with EPA Superfund expenditures perhaps limited to investigation and monitoring costs. This option has been codified in the amendments to CERCLA. *See* SARA, § 122, 42 U.S.C. § 9622. See generally, Note, "Superfund

Settlements: The Failed Promise of the 1986 Amendments," 74 Virginia L.Rev. 123 (1988).

**29.** The general principle of mitigation is described in *Green v. Smith,* 261 Cal.App.2d 392, 396–97, 67 Cal.Rptr. 796 (1968):

A plaintiff cannot be compensated for damages which he could have avoided by reasonable effort or expenditures. [citations omitted] The frequent statement of the principle in terms of a "duty" imposed on the injured party has been criticized on the theory that a breach of the "duty" does not give rise to a correlative right of action. [citations omitted] It is perhaps more accurate to say that the wrongdoer is not required to compensate the injured party for damages which are avoidable by reasonable effort on the latter's part. [citations omitted]

See also Legislative Committee Comment–Assembly to California Civil Code § 1951.2 which adopts this theory in the landlord-tenant context, quotes *Green,* and provides discussion.

3d 1051, 1065 n. 14, 232 Cal.Rptr. 528, 728 P.2d 1163 (1986); *Miller v. American Honda Motor Co.,* 184 Cal.App.3d 1014, 1019, 229 Cal.Rptr. 523 (1986).

The principle of mitigation of damages is also promoted by the State of California in connection with its regulation of water quality. The California Water Code, § 13000 *et seq.,* has an elaborate apparatus for the enforcement of laws regulating the maintenance and protection of water quality. Among the enforcement mechanisms is § 13350 which provides for civil liability for violation of the laws. Among the factors to be considered by the State Attorney General when enforcing § 13350 is the length of time over which the violation occurs and "corrective action, if any, taken by the discharger." § 13350(g). Hence mitigation of water contamination is explicitly recognized and encouraged in connection with California's regulation of the quality of water in the State.

Not surprisingly, the principle of mitigation of damages has found recognition within the context of California insurance law. In *Globe Indemnity Co. v. State of California,* 43 Cal.App.3d 745, 118 Cal. Rptr. 75 (1974), the California Court of Appeal recognized an insured's right to compensation for expenses incurred in attempting to prevent the spread of fire from the property of the insureds to property of others. The insureds held a comprehensive general liability insurance policy with language identical to the relevant language in Intel's policy.[30] There is a statutory provision allowing persons to recover costs incurred in suppressing a fire caused by another, *see* California Health and Safety Code § 13009, and California courts recognize absent any statute that "one protecting his own property has the right to recover fire suppression costs from the wrongdoer." *Globe Indemnity,* 43 Cal.App.3d at 749, 118 Cal.Rptr. 75; *People v. Wilson,* 240 Cal.App.2d 574, 576, 49 Cal.Rptr. 792 (1966). However, a significantly different question was addressed in *Globe Indemni-*ty, specifically, may an insured claim compensation against its comprehensive general liability policy for expenses incurred in preventing or mitigating damage to property of a third party? The court first concluded that the insured certainly was liable for the damage caused to third parties by the fire—this was obviously within the scope of the policy. The Court then went on to reason:

> When an insured takes out an indemnity policy, as in this case, it is ... reasonable to suppose that he expects to be protected by his insurance in any situation wherein be becomes liable for damage to tangible property. It would seem strangely incongruous to him, as it does to us, that his policy would cover him for damages to tangible property destroyed through his negligence in allowing a fire to escape but not for the sums incurred in mitigating such damages by suppressing the fire.
>
> We cannot conceive as reasonable a rule of law which would encourage an insured property owner not to report that neighboring property was being destroyed by reason of his negligence in permitting a fire to escape from his property because his insurance would cover him for the property damage but not for the fire suppression costs. We do not believe the facts of this case direct us to reach such an unreasonable and potentially stultifying conclusion.
>
> A rule, reasonable applied, permitting expenses incurred in the mitigation of damages to tangible property to be recoverable under policies insuring against liability incurred because of damages to tangible property would seem to require universal application as it encourages a most salutary course of conduct. Such a rule is statutorily recognized in a limited context in subdivision (b) of section 531 of the Insurance Code; this subdivision holds that an insurer is liable "[i]f a loss

---

**30.** The comprehensive general liability insurance policy stated: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury or ... property damage to which this insurance applies, caused by an occurrence...." 43 Cal.App.3d at 748–49, 118 Cal.Rptr. 75.

is caused by efforts to rescue the thing insured from a peril insured against." 43 Cal.App.3d 751–52, 118 Cal.Rptr. 75. Thus, the Court held that the claim for fire suppression costs was covered under the terms of the policy.

This Court concludes that the California Supreme Court would hold that costs incurred by an insured in investigating and cleaning up pollution (in particular, hazardous waste) that is damaging public property and posing an established threat to public health are covered by the terms of a comprehensive general liability policy. The problem confronted by the California Court of Appeal in *Globe Indemnity* is directly analogous to the problem here and the analysis applied in *Globe Indemnity* is equally applicable here. California Insurance Code § 531 is also literally applicable [31] because Intel is incurring loss in its efforts to rescue and revive California's ground water from the peril of toxic contamination, a peril (third-party property damage) that is covered by the terms of the policy. This conclusion and result is consistent with the strong predilection of the State of California for the mitigation of damages whenever possible.

The application of *Globe Indemnity*'s mitigation analysis to hazardous waste pollution is also consistent with other cases reported around the country. In a decision that has since been depublished but remains sound guiding analysis, a district court in New York concluded that work done on property to prevent further oil seepage was, as a matter of law, within the comprehensive general liability policy's coverage. *Bankers Trust Co. v. Hartford Accident and Indemnity Co.,* 518 F.Supp. 371, 373 (S.D.N.Y.1981), *vacated,* 621 F.Supp. 685 (S.D.N.Y.1981).[32] Defendant Hartford was the defendant in *Bankers Trust* and the comprehensive general liability policy involved was identical to the policy at issue in this case. The Court's logic was professedly one of reasonableness:

> As noted above, if the policy did not cover this situation, plaintiffs could have allowed the oil to continue to pollute the river and its shores, causing further social damage to third parties, and ironically ultimately costing even Hartford more money.

518 F.Supp. at 374.

This logic recognizes the reasonableness and social utility of mitigation and has been adopted by numerous courts. The Ninth Circuit, for example, has rejected one insurer's "strange kind of justice, and a stranger kind of logic" in ruling that an insured's liability policy covered losses sustained by a third-party tug boat operator after the tug saved the insured's barge (which was covered under the policy) from total destruction. *See Goodyear Rubber & Supply, Inc. v. Great American Ins. Co.,* 545 F.2d 95, 96 (9th Cir.1976) (applying Oregon law). *See also Consolidated Rail Corp. v. Certain Underwriters at Lloyds,* Civ.A. No. 84–2609 (E.D.Pa. June 5, 1986) (unreported decision available on Westlaw at 1986 WL 6547) (expenditures made in part to clean up insured's own property are recoverable as mitigation costs);[33] *E.C.*

**31.** The relevant text of Insurance Code § 531 is as follows:

> An insurer is liable:
> (b) If a loss is caused by efforts to rescue the thing insured from a peril insured against.

**32.** Counsel for Intel has attempted to shed light on the events leading to the vacation of Judge Lasker's opinion in *Bankers Trust.* According to an affidavit filed by counsel for Bankers Trust Company, Hartford moved for reconsideration of the summary judgment ruling and offered to pay his client $2.3 million (approximately $200,000 more than the value of Bankers Trust's victorious claim) to settle the case, with the understanding that the opinion would be withdrawn. *See Affidavit of David B. Eizenman.* After the settlement was finalized and the pay-off made, Hartford informed Judge Lasker that the motion was now moot because the suit was settled. The Court then "denied as moot" the motion and vacated the prior ruling. This bit of history is interesting, but of course it has no bearing on this Court's ruling, nor does it affect the persuasive value of Judge Lasker's opinion.

**33.** One passage from the opinion in *Consolidated Rail* is particularly apropos in the context of this case. The court stated:

> There is no logical or just reason why an insured should allow a condition on his land to result in damage to others simply to assure and secure coverage when preventive measures could prevent not only substantial dam-

*Electro Plating, Inc. v. Federal Ins. Co.,* Docket No. L–062919–85 (Super.Ct.N.J. February 18, 1986) (defendants are obligated to reimburse insured "for response and remedial costs arising out of the [d]ischarge which are reasonable and necessary to protect and clean the environment and to prevent further environmental degradation."); *Aronson Associates, Inc. v. Pennsylvania Nat'l Mutual Casualty Ins. Co.,* 14 Pa. D & C 3d 1 (C.P.Pa 1977) ("The expenses incurred by [insured] in attempting to recover the escaped gasoline and prevent its escape to the property of third persons are recoverable under" the policy.) *aff'd,* 272 Pa.Super. 606, 422 A.2d 689 (1979). Mitigation of damages is a widely recognized principle. The fact that other courts around the United States have seen fit to extend it to insureds' mitigation of pollution damage merely serves to underscore the "salutary" application of the doctrine under California law as described in *Globe Indemnity.*

A final reason to recognize coverage of Intel's investigation and response costs in this case lies in the realm of public policy. Even if the literal terms of California law did not provide coverage and the doctrine of mitigation did not exist in California, absent contrary law, there are strong public policy reasons for recognizing coverage in this case. From the federal perspective, there simply is not enough money in Superfund and enough "horse-power" in the EPA to clean up first and seek PRP reimbursement later. The EPA and Congress have recognized that even with increased appropriations, industry cooperation is essential to begin to combat the nation's hazardous waste problem. Prospects for PRP cooperation would be undermined if insurer's contributions are made contingent on a government cleanup first, followed by a judgment against the insured, and then a claim against the insurer. The EPA has had enough trouble merely sizing up the problem without allowing the efficient implementation of cleanup programs to be

age or loss to the property of others, but also prevent sizeable claims for damages against

impaired by the convenience of the insurance industry.

From its perspective, California's interest in promoting expeditious and effective cleanup of toxic pollution is no less important than the federal Superfund program. This interest has been summarized and codified in various provisions of the California Health and Safety Code covering topics such as: hazardous waste control, §§ 25100–25249; underground storage of hazardous substances, §§ 25280–25299.6; management of used oil, §§ 25250–25250.-24; hazardous substance accounts (and their operation), §§ 25351–25367; and hazardous substance cleanup, §§ 25385–25386.6.

These and other laws demonstrate California's expression of profound interest in coming to terms with the problem of hazardous waste contamination. The cooperation of PRPs is vital to the State's cleanup efforts and that cooperation would be impaired if insurers are able to deny policy coverage until the insured PRP is sued in court for cleanup costs incurred by government entities. Like the EPA, California would be deterred in its cleanup efforts by a ruling of non-coverage in this case. This, then, is a final reason why Hartford must be found liable for the reasonable cost of cleaning up the Middlefield Road Property.

(vii) *Mitigation of Damages Versus Cleanup of Subject Property:*

One final issue remains. Hartford makes a point that Intel has not demonstrated what portion of the cleanup costs are attributable to abatement of damage to third party interests "as opposed to merely cleaning up its own property." *Opposition Brief* at 19. In particular, Hartford relies on *Broadwell Realty Services, Inc. v. The Fidelity and Casualty Co. of New York,* 218 N.J.Super. 516, 528 A.2d 76 (App.Div. 1987) wherein the court stated:

We stress that [a finding of coverage] does not, however, include elements of the claim which relate to remedies for

the insured and his insurer.

damage confined to [the insured] Broadwell's property. *To the extent that all or a portion of the response expenses pertain solely to damage to the Broadwell site itself and not to prevent off-site contamination, the owned-property exclusion clearly applies, and such damage is not within the coverage provided.* We recognize that it may be extremely difficult to segregate and distinguish between cleanup expenses attributable to correcting damage to Broadwell's property, which are not recoverable, and those attributable to abatement of damage to adjacent lands, which are. We further acknowledge that the distinction between the two may to some extent become blurred. Nevertheless, we are convinced that such an allocation is necessary and best fulfills the reasonable expectations of the parties.

218 N.J.Super. at 528–29, 528 A.2d 76 [emphasis added.]

This point is well taken with regard to expenses not included within the scope of the Consent Decree. This Court agrees with the analysis in *Broadwell* that for purposes of determining what portion of cleanup expenses are attributable to the insurer, there may be the need for a delicate factual assessment. Hartford cannot be required to cover response expenses which pertain solely to damage to the Middlefield Road site itself. The trier of fact is responsible for the difficult task of segregating such costs and determining the proper amount of damages coverage.

On a different level, however, the analytical segregation of costs is not as acute a challenge as supposed by the court in *Broadwell.* One must begin from the premise that the EPA and the relevant state authorities in each case have been charged by the people with the responsibility of faithfully executing the law in addition to overseeing the faithful observance of the law. Congress has given the EPA wide-ranging discretion to satisfy the mandates of the National Contingency Plan. Hence, barring an abuse of discretion, EPA's determination of the appropriate nature and scope for a cleanup (i.e. whether it is consistent with the NCP) is a determina-

tion that is not easily upset by a court of law.

In this case, EPA and California authorities have concluded that certain steps are necessary to meet the health and safety mandates of the laws. These initial steps are formally announced in the Consent Decree. As long as Intel operates according to the Consent Decree, its activities are consistent with the NCP and relevant California law, and its costs are "reasonably incurred" as "necessary costs of response." *See Consent Decree* at 3, 6. As a matter of law, the Court finds that all expenses incurred by Intel pursuant to the Consent Decree are governmentally-mandated cleanup expenses which are fully compensable under the terms of the Hartford comprehensive general liability policy.

Pre–Consent Decree response costs are also compensable to the extent that they are consistent with the Consent Decree or form a foundation for the work embodied in the Consent Decree. It would be contrary to the public interest to deny insureds compensation for these costs, because it would discourage PRPs from taking the initiative to implement cleanup prior to the arrival on the scene of the EPA. Similarly, if the response action taken by the PRP involves costs that the EPA is likely to have mandated, PRPs should not be discouraged from acting promptly while holding a reasonable expectation of reimbursement from its insured—if appropriate—at some later date. Hence, if the EPA is likely to have authorized the expenditures as consistent with the NCP or as necessary in the aid of protecting the public health or welfare, then the associated response costs are properly attributable to the insurer.

Unfortunately, the Consent Decree is prospective only, stating that the activities carried out by the respondents in the future are consistent with the NCP and the Carpenter–Presley Act. The trier of fact is responsible for determining what pre-Consent Decree costs are consistent with or a foundation for the implementation of the Consent Decree. In practical terms, this means that the trier of fact faces a two-

step process in determining the proper amount of the insurer's coverage of damages. First, the trier of fact must segregate those expenses which are contemplated in, consistent with, or a foundation for the Consent Decree as against expenses that are not. The former are covered by the insurer, the latter may or may not be covered. Second, as to those pre-Consent Decree expenses that are not a foundation for the implementation of the Consent Decree plan or not consistent with that plan, the trier of fact must do the *Broadwell* analysis of separating for purposes of nonpayment those response expenses that solely relate to damage to the Middlefield Road site itself.

## IV. CONCLUSION.

For the reasons explained above, the Court hereby grants plaintiff's motion for partial summary judgment.

IT IS SO ORDERED.