Gene F. MORRIS, Plaintiff-Respondent,

v.

G. Findlay REED and G. Findlay Reed, Inc., Defendants,
and
The Home Insurance Company, Defendant-Appellant.

Gene F. MORRIS, Plaintiff-Appellant,

v.

G. Findlay REED and G. Findlay Reed, Inc., Defendants,

The Home Insurance Company, Defendant-Respondent.

Nos. KCD 26178, 26179.

Missouri Court of Appeals, Kansas City District.

May 6, 1974.

Rehearing Denied June 3, 1974.

Kenneth O. Smith, Stephen D. Manz, Lowell L. Knipmeyer, Kansas City, for defendant-appellant Home Ins. Co.

Michael J. Albano, Graham, Paden, Welch & Martin, Independence, for plaintiff-respondent Gene F. Morris.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

WASSERSTROM, Judge.

In the court below plaintiff received a directed verdict in the sum of $74,000.00 on an insurance policy plus interest thereon, but the court declined to impose penalties against the insurer for vexatious delay. The defendant insurance company appeals from the award of damages, while plaintiff cross-appeals from the denial of statutory penalties.

The events giving rise to the present controversy occurred in December, 1966. Until the latter part of that month, Jay Appleson owned and operated the Buckingham Hotel. He became delinquent on a note secured by second mortgage on that property, and the note holder, Mark Southard, commenced foreclosure proceedings.

While those proceedings were pending, plaintiff purchased Southard's note on about December 10. Thereafter and sometime prior to December 25, plaintiff telephoned the offices of G. Findlay Reed, Inc., an insurance agency which was a general agent for defendant Home Insurance Company. Plaintiff's call was for the purpose of verifying that Home had insurance coverage covering Appleson's interest in the Buckingham Hotel. Reed, the president of the company and the one who took this call, responded that he would have to check the file since this was an account being handled by another man in the office, who was out of town. Reed did check the file and verified to plaintiff that Home had the coverage mentioned. Plaintiff advised Reed at that time that he had a second mortgage on the property and was going to foreclose.

Soon thereafter, the foreclosure was consummated and plaintiff got a trustee's deed on December 29. Just prior to or after the foreclosure sale, plaintiff called Reed for a second time and told him that he should be the named insured on the policy. In response to that request, Reed stated, "All right, I'll take care of it."

Nothing was done about this insurance matter at the Reed Agency until December 29, when Gordon Naughton, who handled this account, returned to Kansas City. Naughton made a call the following day to the home of the first mortgage holder, Mrs. Colgrove, who was the one who actually produced this insurance business for the Reed Agency, to ascertain that she knew about the change of ownership of the hotel and that a change in the insurance was agreeable to her. An affirmative answer was forthcoming, but Naughton did nothing further at that time.

On Friday, December 31, a fire occurred at the Buckingham Hotel, with extensive damage. The police and fire departments, on the basis of their inspections, concluded that the fire was of an incendiary origin.

On the next business day, January 3, 1967, Naughton proceeded to prepare two documents. One was a form of consent to be executed by Appleson, which Naughton mailed that day to Appleson. The second

document was a notice of loss to Home Insurance Company, which Naughton made out showing plaintiff as the insured. This notice of loss was prepared in accordance with what Naughton testified was his intention to cover plaintiff effective from December 27, 1966, which he understood to be the date of plaintiff's second telephone conversation with Reed.

Defendant Home then launched a thorough investigation, one result of which was to obtain a detailed estimate of loss showing that the cost of repair to the building would be approximately $144,000. Another element of the investigation was the taking of a written statement from Reed in which he reported to the company that he had engaged in the telephone conversations with plaintiff described above. As a result of the investigation so made, the attorney representing the insurance company wrote a denial of liability to the plaintiff on April 27, 1967, in which the denial was placed on the sole ground "that there was no oral or written binder or oral or written contract of insurance on the date of the captioned fire with the Home Insurance Company and on that date your interest, if any, in the Buckingham Hotel was not insured by it."

Shortly after that denial of liability, plaintiff solicited some sort of settlement from the insurance company, and in the course of those negotiations, Home's lawyer stated the opinion that the Reed Agency was legally liable for not having taken the necessary and proper steps to effect insurance. Finally a settlement was reached under which plaintiff executed a complete release for $9,918.97, plus an assignment to him of the first mortgage note which the insurer had received when it made payment to Mrs. Colgrove. The release agreement specifically reserved to plaintiff all rights of action against the Reed Agency. The insurance company's pleased surprise at this favorable settlement was evidenced by a comment on notations in the home office file, "Still cannot believe or under-

stand why Morris would let us off hook so cheaply."

Pursuant to the reservation of right set forth in the settlement with Home, plaintiff filed suit against G. Findlay Reed and G. Findlay Reed, Inc., on the theory that those defendants had failed in their agreement to obtain effective insurance on the Buckingham Hotel. After more than two years of pendency, that suit was amended to add Home as an additional party defendant.

At the close of the plaintiff's case, defendants Reed and Reed, Inc., moved for a directed verdict and those motions were granted. At the close of all the evidence, both plaintiff and defendant Home filed their respective motions for directed verdict. The motion of plaintiff was granted, and that of defendant Home was denied. The parties then agreed that the court might rule on the issue of vexatious delay without intervention of a jury; and with respect to that issue, the court declined to impose vexatious delay penalties.

On this appeal, Home argues first that the court should not have directed a verdict for the plaintiff because there were factual issues which should have been submitted to the jury. Its other principal point is that it should have received a directed verdict in its own favor, because of the release which had been executed by plaintiff in 1967.

On the part of plaintiff, his cross-appeal complains that the trial court committed an abuse of discretion by not granting vexatious delay penalties.

I.

█ Before dealing with the contentions on the merits, the pending motions on procedural points call for disposition. The first of these motions is that of plaintiff to dismiss Home's brief as appellant on the ground that it fails to set forth a fair statement of facts as required by Rule 84.-

04(c), V.A.M.R. Subsequent to the filing of this motion, Home was granted permission to correct its brief and pursuant to that permission Home has submitted a substitute brief. The substitute brief does comply with Rule 84.04(c), and this motion by plaintiff is therefore overruled.

The next procedural point raised by motion is the request by plaintiff to strike points I, II and IV of Home's brief as appellant on the ground that these points were not adequately preserved in the trial court. A review of the record shows that these points were adequately preserved by after trial motions, and the request to dismiss these points is therefore overruled.

Plaintiff's next point raised by motion asks for dismissal of five points in Home's reply brief on the ground that these points attempt to reargue matters covered in Home's principal brief, in violation of Rule 84.04(g). Although Home has retained the same captions to identify subject headings in both its principal and reply brief, the substance of the reply brief itself consists of perfectly proper rebuttal material, except in one single respect. That exception relates to Home's attempt to interject in its reply brief for the first time a new theory of defense. This new argument challenges the sufficiency of plaintiff's proof of its right to recover on the ground that the policy contained an 80% coinsurance clause and plaintiff failed to introduce evidence showing that the amount of coverage was in fact at least 80% of the loss suffered.

This new argument cannot properly be considered. No new theory may be interjected for the first time by way of a reply brief. Baker v. St. Paul Fire & Marine Insurance Co., 427 S.W.2d 281, 294 (Mo.App.1968); Denney v. Spot Martin, Inc., 328 S.W.2d 399, 405 (Mo.App.1959); Arnold v. Brotherhood of Locomotive Firemen, 232 Mo.App. 325, 106 S.W.2d 32, 36 (1937). While this rule of law precludes consideration of this new point, the temptation is irresistible to point out that this claim of failure to insure to at least 80% (which would be a matter of under-insurance), is utterly inconsistent with Home's charge in another connection that plaintiff overinsured the property. See footnote 1 under Point II, B, of this opinion.

Plaintiff's motion last mentioned is sustained insofar as it pertains to the matter of alleged violation of the coinsurance clause. In all other respects, it is overruled.

## II.

Coming now to Home's contentions on the merits, its position rests upon the foundation that plaintiff had the burden of proof on showing his right to recover and especially to show some basis for setting aside the release dated May 3, 1967. Home correctly points out that it is only in very unusual cases that a court may properly direct a verdict in favor of the party having the burden of proof. On the other hand, it is equally well settled that a court may so direct a verdict where there is no genuine issue of fact for jury consideration, as where all elements of the plaintiff's case appears from the defendant's own evidence. Alaska Federal Savings & Loan Association v. Hoffman, 485 S.W.2d 118 (Mo.App.1972); Auffenberg v. Hafley, 457 S.W.2d 929 (Mo.App.1970); Noble v. Missouri Ins. Co., 204 S.W.2d 446 (Mo. App.1947).

The parties have no disagreement with respect to the foregoing general principles. However, they sharply part ways as to how these principles apply to the facts of this case. Home insists that the facts of record show that there were genuine issues of fact for consideration of the jury with respect to each of the following questions: a) whether there was any coverage by Home on behalf of plaintiff; b) whether plaintiff committed arson; and c) whether the fire loss was equal to the full amount of the insurance.

A.

The issue of whether or not coverage had actually been effected in favor of plaintiff by the Reed Agency has always been and continues on this appeal to be the major question vehemently debated by the parties. Plaintiff's position and the one which was adopted by the trial court is that the evidence shows beyond reasonable question that the Reed Agency as general agents for Home orally agreed to this insurance coverage.

█ Missouri law recognizes an oral contract for insurance, provided the following five elements are agreed between the parties: "First, the subject-matter; second, the risk insured against; third, the amount; fourth, the duration of the risk; and fifth, the premium. It is not essential that all of these elements of the contract be expressly agreed upon if the intention of the parties to the contract in these particulars can be gathered from the circumstances of the case." Chailland v. M.F.A. Mutual Insurance Co., 375 S.W.2d 78, l. c. 81 (Mo. banc 1964).

█ Sufficient specificity as to these five elements can be found without difficulty under the circumstances here, in view of the fact that the discussions between plaintiff and Reed at all times referred to coverage already in existence and those parties had a fixed understanding that they were talking about the Buckingham Hotel. and the risks, amount, duration and premium as already set forth in the Appleson policy. Indeed, the very purpose of plaintiff's first call to the Reed Agency was to ascertain those various elements and those facts were verified to plaintiff by the president of the agency. Under these circumstances, there can be no doubt whatsoever but that the parties had a full and complete understanding with respect to the five necessary elements. The only one of those elements which was not a matter of discussion between plaintiff and Reed was the amount of the premium, but that is a matter set by law so that no specific mention

between the parties is necessary and the payment of the legally necessary premium will be implied as a matter of law once it is shown that an agreement was in fact reached for the insurance placement. Robinson v. Franklin Fire Ins. Co. of Philadelphia, 225 Mo.App. 960, 35 S.W.2d 635 (1931).

This narrows the issue therefore to the question of whether the statements and conduct of the Reed Agency were sufficient to constitute an agreement to insure plaintiff. The exact character of the statements made to plaintiff by Reed and the acts thereafter by Naughton do not fall in any realm of doubt. Within a short time after the fire, Home procured a full written statement from Reed, and it was upon that statement that the company relied at the time it made its denial of liability on April 27, 1967. The company at no time ever challenged or raised any question but what the conversations between Reed and the plaintiff took place in the manner as set out by Reed in his written statement given to the company as part of its investigation.

█ That statement shows that plaintiff did call in order to obtain insurance coverage in his own name on the Buckingham Hotel, title to which he had just acquired or was about to acquire. In response to that request, Reed answered, "All right, I'll take care of it." That answer was plain and clear and could only have been understood by plaintiff as an acceptance of his request for the insurance coverage. Like language has been held sufficient to create oral insurance under similar circumstances in Ewing v. Dubuque Fire & Marine Ins. Co., 237 S.W.2d 498 (Mo.App.1951) and in Klaber v. Corporation of Royal Exchange Assur., 48 S.W.2d 62 (Mo.App.1932).

Home however seeks to escape the force of the foregoing by arguing that the Reed Agency intended only to try to get an assignment of the existing policy from Appleson; and that since no assignment was ever executed by Appleson, the result must

be that no insurance ever actually accrued to plaintiff. This argument ignores the true import of the final telephone conversation between plaintiff and Reed before the fire, which was to create an obligation of insurance. It mattered not to plaintiff whether that insurance was effected by an assignment of the existing policy or by the issuance of new independent coverage. Concededly, the Reed Agency as general agents for Home had full authority to either accept an assignment of the old policy or to bind plaintiff by a brand new policy. As a matter of fact, Naughton testified that it was his firm intention prior to the fire to effect coverage for plaintiff in either one or the other of those two ways. Not only was that his testimony at trial, but that intention on his part was clearly reflected by his action on January 3, 1967, the first business day after the fire, when he submitted to Home a notice of loss showing plaintiff as the insured to the extent of $100,000 on the Buckingham Hotel. It is of at least passing interest that it was only later that another Home representative saw fit to order a change of the name appearing on various forms from plaintiff as the named insured, to the name of Appleson.

Under the facts and the law, there could be no good faith conclusion other than that the Reed Agency had agreed to cover plaintiff for this insurance.

### B.

◼ Concerning the last two items which Home claims to be matters of genuine dispute, namely the alleged arson and the extent of loss, plaintiff resists consideration on the ground that the denial of liability dated April 27, 1967, contained no reference thereto. In support of that position plaintiff cites Kammeyer v. Concordia Telephone Co., 446 S.W.2d 486 (Mo.App. 1969) and Aetna Casualty & Surety Co. v. Haas, 422 S.W.2d 316 (Mo.1968), which hold that once an insurer denies liability on a given ground, it may not thereafter defend on different grounds. Other Missouri cases also declare the rule in those broad general terms reflecting the doctrine of waiver. State Farm Mutual Auto. Ins. Co. v. Central Surety & Insurance Corp., 405 S.W.2d 530, 532 (Mo.App.1966); McCarty v. United Ins. Co., 259 S.W.2d 91, 94 (Mo.App.1953); Gabriel v. Farmers Mutual Fire Ins. Co., 108 S.W.2d 628, 631 (Mo.App.1937); Carroll v. Union Marine Ins. Co., 249 S.W. 691 (Mo.App.1923); Delmar Bank of University City v. Fidelity & Deposit Co. of Maryland, 428 F.2d 32 (8th Cir. 1970). On the other hand, Home relies upon Mitchell v. American Mutual Ass'n., 226 Mo.App. 696, 46 S.W.2d 231, 1. c. 237–238 (1932) which holds that the rule in question does not apply absent some element of prejudice to the claimant. Other authorities, including the latest pronouncement of this court, similarly announce the rule in terms of the doctrine of estoppel. Stone v. Waters, 483 S.W.2d 639, 1. c. 645 (Mo.App.1972); Grafe v. Fidelity Mutual Life Ins. Co., 84 S.W.2d 400 (Mo.App. 1935); 45 C.J.S. Insurance § 707, page 677. At least one jurisdiction has made a sharp choice between the concepts of waiver and estoppel and has adopted the waiver approach, so as to make unnecessary the showing of any prejudice to the claimant. Armstrong v. Hanover Insurance Co., 130 Vt. 182, 289 A.2d 669, 673 (1972).

However, this seeming conflict, so far as it concerns the law of this state, is more apparent than real. This is for the reason that no Missouri case has required any more than a very slight degree of prejudice to the claimant in this situation, it being held that the mere trouble and expense of bringing suit is enough. Stone v. Waters, supra; Goffe v. National Surety Co., 321 Mo. 140, 9 S.W.2d 929, 938 (1928); Ash-Grove L. & P. Cement Co. v. Southern Surety Co., 225 Mo.App. 712, 39 S.W.2d 434, 441 (1931). See also 43 Am. Jur.2d, Insurance § 1146, pages 1069–1070.

◼ Much more trouble and expense has been caused to this plaintiff than just

the normal filing of a lawsuit. The evidence shows that Home and its representatives followed a course of conduct calculated to deflect plaintiff from the insurance company as his target and to change his aim toward the Reed Agency as the object of his legal attention. The lawyer who handled the investigation and settlement negotiations testified that in connection with his discussions with the plaintiff following the denial of liability on April 24, 1967, he advised plaintiff that he considered the Reed Agency legally responsible for plaintiff's failure to have insurance coverage and that he had a cause of action against Reed. In line with that approach, the release drafted by the insurance company lawyer expressly reserved a right of action to plaintiff against Reed and the Reed Agency. So it was a natural consequence of Home's attitude, as expressed in its denial of liability and consistently maintained ever since, that plaintiff initially filed his lawsuit against Reed and the Reed Agency as sole defendants. Only after more than two years of litigation preparation had elapsed did plaintiff reevaluate the situation and add Home as a defendant in this case. If the mere expense of filing the usual type of lawsuit against an insurance company be enough to satisfy the requirement of prejudice, as held in Stone v. Waters, supra, then surely the extended and complicated litigation here, in which other defendants were involved because of the position taken by the insurance company, must be held more than sufficient to show the necessary degree of prejudice.

However, even if the doctrines of waiver and estoppel did not bar Home

from urging their last two claimed elements of dispute, nevertheless, those disputes are illusory rather than genuine. So far as the claim of arson is concerned, the burden of showing such a defense would be upon the insurance company. There was no evidence upon which to make such a charge in good faith against the plaintiff. To be sure, there was abundant evidence that someone had committed arson. The available evidence, however, to the extent that it inculpated anyone, pointed to Appleson rather than plaintiff. Plaintiff had not taken charge of the property, and at the time of the fire Appleson was still in control of the premises. Appleson had turned off the utilities and ordered all of the tenants out. He is the one who had padlocked the entrance. There had been a dispute between plaintiff and Appleson, and Appleson apparently continued to make claim to right of possession. But it is unnecessary to reach any conclusion as to who was responsible for this fire. It suffices to say that no evidence of any significance was adduced by Home implicating plaintiff, and the furthest reach of Home's argument goes no further at most than to create a slight suspicion.[1] When it is remembered that Home in effect now charges plaintiff with criminal activity, evidence of the poor caliber offered by it does not meet the requirements necessary to overcome the presumption that men are honest and actuated by correct motives. Garrison v. United States Fidelity & Guaranty Co., 506 S.W.2d 87, 89 (Mo.App. 1974).

Equally lacking in merit is Home's claim of a genuine dispute concerning the

1. A fact which Home emphasizes is that plaintiff purchased the second mortgage for $12,500, and that almost immediately thereafter he procured insurance for $100,000. From this it argues in its brief that, "Clearly, his interest in the building was over-insured and Home knew and relied on this in disputing liability." This argument contrasts strangely with Home's argument in another

connection, already considered, that plaintiff under-insured the building. In any event, the amount of the insurance has little significance as indicating a plot by plaintiff to commit arson, since all he did was to adopt the very same amount of insurance which had been placed on the property by his predecessor in title and which was already currently in effect.

extent of the loss. The expert hired by its own adjuster made a detailed study of the Buckingham Hotel after the fire and submitted a loss estimate to Home of $144,947. This, of course, was substantially, in excess of the face of the policy, and there is no indication that Home or any of its representatives ever had any doubt concerning the loss being in an amount at least equal to the full policy limit. To the contrary, a handwritten memorandum which turned up in the Home Company file states, "Loss would be total if held we had binder in force." Although Home strives desperately to read the word "would" as being "could", it takes no hand-writing expertise to decipher this notation. The only way this hand-written word can be read is as "would," with the result that the company by its own admission considered the amount of loss to be beyond genuine controversy. See in this connection the "valued policy" provision of RSMo.1969, § 379.140, V.A.M.S.

No matter how approached nor how leniently the rules of law are applied, the record here shows no genuine dispute of fact which required submission to a jury.

### III.

Defendant Home also argues that it should have received a directed verdict in its own favor based upon the release dated May 3, 1967. However, a release based on a settlement for an amount less than that claimed by the insured must be based upon a valid consideration. The existence of a bona fide dispute between the parties will serve as the required consideration, but for that purpose the dispute must be founded upon evidence which would cause a reasonable person in good faith to believe that the insurer had a valid defense. Foster v. Aetna Life Ins. Co., 176 S.W.2d 482, 485, 352 Mo. 166 (1943); Duncan v. Black, 324 S.W.2d 483, 486 (Mo.

App.1959); Noble v. Missouri Ins. Co., 204 S.W.2d 446 (Mo.App.1947); Yancey v. Central Mutual Ins. Ass'n., 77 S.W.2d 149 (Mo.App.1934); Butler v. Missouri Ins. Co., 187 S.W.2d 56 (Mo.App.1945).

The various items of dispute alleged by Home to have existed at the time of the execution of the release have already been fully discussed under point II of this opinion. For the same reason that those "disputes" were insufficient to require submission to a jury, so also they are insufficient to constitute consideration to support the release. Home knew or should have known at the time of the release all the facts which were disclosed at the trial.

Home lays considerable stress on the fact that plaintiff signed a release which set out detailed items which were stipulated to constitute outstanding disputes between the parties. However, mere recitals of this type in a release are not enough to show the existence of consideration—there must be evidence to show that there was in fact an honest dispute in good faith. Sappington v. Central Mutual Ins. Ass'n., 229 Mo.App. 222, 77 S.W.2d 140 (1934).

### IV.

Turning now to plaintiff's appeal, he contends the trial court committed an abuse of discretion by refusing to award vexatious delay penalties under RSMo. 1969 § 375.420, V.A.M.S. That statute provides that in the event an insurance company vexatiously refuses to pay a loss, then the court or jury "may" allow a penalty "not to exceed" ten percent of the loss and a reasonable attorney's fee. This statute on its face is permissive, not mandatory. The question of whether any penalty shall be awarded, and if so, how much, is a matter of pure discretion. The ruling in Noble v. Missouri Ins. Co., 204 S.W.2d

446, 450 (Mo.App.1947) is squarely in point:

"The statute provides that if it appears from the evidence that the company has vexatiously refused to pay the loss, the court or jury 'may' allow damages in addition to the amount of the loss with interest. Sec. 6040, R.S.Mo. 1939, Mo.R. S.A. § 6040. In other words, the statutory penalty does not go as a matter of course or of law, but instead its allowance rests in the discretion of the trier of the facts. The law may support the allowance of the penalty, but it will not compel it."

The judgment is affirmed. Costs on both appeals will be aggregated and then assessed equally between plaintiff and Home.

All concur.