734 F.Supp. 896 (1990)
HOSPITAL PRODUCTS, INC., Plaintiff,
v.
STERILE DESIGN, INC., Defendant.
No. 88-1186C(1).
United States District Court, E.D. Missouri.
April 4, 1990.
*897 *898 Mitchell Kramer, Philadelphia, Pa., J. Peter Schmitz, Biggs & Hensley, St. Louis, Mo., for plaintiff.
J. William Newbold, Coburn, Croft & Putzell, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
This matter is now before the Court on defendant's motion for summary judgment on Counts I, II and III of plaintiff's complaint.

I. Facts

The following facts are undisputed:
In February of 1982, Hospital Products, Inc., ("Hospital Products") entered into a contract with Custom Hospital Products, Inc., ("Custom Products") wherein the parties to the contract agreed that Hospital Products would serve as Custom Products' sales representative for products manufactured by Sterile Design, Inc. ("Sterile Design"). Hospital Products is a subchapter S corporation whose only shareholders are John Dockery and Terry Penke. Custom Products was a distributor for Sterile Design's products. Sterile Design is a manufacturer of medical surgical procedure trays and other health care products. Specifically, the contract between Hospital Products and Custom Products provided that Hospital Products was to serve as the exclusive representative for Sterile Design's products in the states of Iowa and Nebraska for a period of ten years, subject to a one year "trial period", which was to end January 31, 1983. Hospital Products was to receive a sales commission for all sales of Sterile Design Products within the designated territory.
Hospital Products completed its one-year trial period. In November of 1984, Custom Products entered into a merger agreement with a wholly owned subsidiary of Sterile Design, wherein Sterile Design agreed to assume all debts, liabilities and duties of Custom Products  including the contract between Custom Products and Hospital Products.[1] Said merger was completed in the fall of 1986.
*899 Also in 1984, Hospital Products "went dormant". It filed only partial tax returns in 1984 and filed no tax returns in 1985, 1986 and 1987. Furthermore, Hospital Products' accountant and its sole shareholders, Mr. Dockery and Mr. Penke, indicate that corporate tax returns were not filed for 1988 and would not be filed for future years because as of 1984, Hospital Products ceased to realize income or incur expenses.
Defendant explains through its various submissions to the Court, and plaintiff has not denied, that in mid-1984 Dockery and Penke ceased to "run their money through" Hospital Products, Inc. Originally, Dockery and Penke had placed all money that they received from Sterile Design into Hospital Products. They had then paid their expenses and taken equal amounts from the balance that remained at the end of each month. In 1984, however, they decided that they wished to be paid for their individual sales rather than splitting the proceeds from their collective efforts. Therefore, Dockery and Penke formed their own separate corporations to sell a variety of hospital products, including those of Sterile Design. Dockery formed Master Medics, Inc. Penke carried on as Terry Penke, d/b/a Hospital Products, Inc., for a short time and then formed Terry Penke & Associates, Inc.
In November of 1987, Sterile Design terminated its contract with Hospital Products. Approximately four years and three months remained under the original ten-year term. In June of 1988, Hospital Products filed the instant action against Sterile Design alleging that by breaching its exclusive sales representative contract with Hospital Products, Sterile Design deprived Hospital Products of commissions, profits, good will, customer access, business advantage and identity, and revenue (Count I); that Sterile Design had deprived Hospital Products of commissions on long-term contracts with hospitals in the region, which contracts Hospital Products had obtained on behalf of Sterile Design (Count II) and; that Sterile Design failed to pay Hospital Products commissions earned by Hospital Products prior to the date of termination (Count III).[2]
Sterile Design has filed motions for summary judgment in supplements. Sterile Design's first motion for summary judgment asserts that Sterile Design was entitled to terminate its contract with Hospital Products because Hospital Products failed to meet its minimum sales goal under the contract and because Hospital Products breached its agreement under the contract not to promote products other than those of Sterile Design. Subsequently, Sterile Design filed a supplemental motion for summary judgment on the basis that because Hospital Products received no income and incurred no expenses for the years immediately preceding and following the termination of the contract, Hospital Products can make no submissible case of damages as a matter of law. Most recently, Sterile Design has filed a "second supplemental motion for summary judgment," wherein Sterile Design argues that it was entitled to terminate its contract with Hospital Products under a contractual provision providing for automatic termination in the event that Hospital Products ceased to function as a "going concern". The Court will discuss the merits of each of defendant's *900 grounds for summary judgment individually.

II. Summary Judgment Standard

In determining whether summary judgment should issue, the facts and inferences from these facts are viewed in the light most favorable to the non-moving party and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R. Civ.P. 56(e). See also 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2739 (1983).
In Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) the United States Supreme Court held that a party seeking summary judgment need not "support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323, 106 S.Ct. at 2552. When, however, the non-moving party will bear the burden of proof at trial with respect to a disputed issue, that party must come forward with the kinds of evidentiary materials listed in Rule 56(c) to avoid summary judgment. Id. at 324, 106 S.Ct. at 2553. Rule 56(c) lists depositions, answers to interrogatories, admissions on file and affidavits as evidence beyond the pleadings that may be used to defeat a motion for summary judgment. Rule 56(c) Fed.R. Civ.P. If, after discovery, a party is unable to produce sufficient evidence to carry its burden of proof at trial, summary judgment is appropriate. Palmer v. Tracor, Inc., 856 F.2d 1131, 1133 (8th Cir.1988).
Recently, the Supreme Court noted that: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to `secure the just, speedy and inexpensive determination of every action'." Celotex, 477 U.S. at 327, 106 S.Ct. at 2554 (quoting Fed.R.Civ.P. 1). Thus the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S.Ct. at 1355. "Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no `genuine issue for trial'." Id. at 587, 106 S.Ct. at 1356. The Eighth Circuit has acknowledged that the "trilogy of recent Supreme Court opinions" demonstrates that the courts should be "more hospitable to summary judgments than in the past" and that a motion for summary judgment "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." City of Mt. Pleasant, Iowa v. Associated Electric Cooperative, Inc., 838 F.2d 268, 273 (8th Cir.1988).

III. Hospital Products' Failure to Meet its 1987 Quota

The parties' agreement provides that plaintiff will be deemed to have breached the agreement and defendant is entitled to terminate the agreement in the event that plaintiff's annual sales fall below eighty percent of its "sales goal". The agreement defines Hospital Products' "sales goal" as a minimum annual goal setting the total dollar amount of products to be sold in Hospital Products' territory in a given year. In the event that Hospital Products fails to achieve eighty percent of the sales projected in Hospital Products' yearly goal, Sterile Design may terminate the agreement for "just cause". Sterile Design argues that the principals of Hospital Products, Dockery and Penke, obtained only 58 and 50 percent, respectively, of their individual sales goals for the 1987 fiscal year. Sterile Design concludes that *901 Hospital Products therefore fell short of the eighty percent requirement, thereby entitling Sterile Design to terminate the agreement.
The Court finds that no question exists but that plaintiff failed to achieve its 1987 sales goal. Although plaintiff offers evidence that Dockery and Penke satisfied their 1986 quota, it offers no evidence suggesting that Hospital Products achieved its 1987 quota. By contrast, defendant has produced the deposition of Sterile Design's North Central Region Manager, which states that the combined sales of Dockery and Penke in 1987 failed to reach eighty percent of plaintiff's sales goal. In addition, defendant has submitted the depositions of both Dockery and Penke wherein both Dockery and Penke state that they did not achieve their sales goals in 1987. In light of defendant's evidence suggesting plaintiff failed to meet its 1987 sales goal and given plaintiff's failure to produce any evidence to the contrary, this Court must conclude that plaintiff failed to achieve its 1987 sales goal.[3]
Plaintiff argues, however, that its 1987 sales goal was inherently "unreasonable". Plaintiff represents that it will produce expert testimony at trial that its 1987 quota was "unreasonable". The Court concludes, however, that the "reasonableness" or "unreasonableness" of plaintiff's sales goal can only be measured by the terms of the contract. The parties' contract does state that plaintiff's quota shall be "reasonable" and based upon "good faith projections" by defendant. The contract then proceeds, however, to set forth the parameters within which defendant must operate in establishing such a "reasonable" or "good faith" quota. Thus, this Court will look only to the standards set forth in the agreement to determine the reasonableness of plaintiff's quota.
In this vein, plaintiff argues that defendant unilaterally imposed the 1987 quota without consulting plaintiff. Under the terms of the contract, however, defendant was entitled to impose a sales goal on plaintiff so long as the goal did not exceed the average percentage increase in sales goals assigned to similarly situated representatives. It is plaintiff's burden to show that defendant breached the contract's requirements regarding quotas. See Hayes v. Reorganized School Dist. No. 4, 590 S.W.2d 115, 116 (Mo.App.1979) (Burden of proving breach of contract rests on the party claiming the breach); Zeppenfeld v. Morgan, 168 S.W.2d 971, 976 (Mo.App. 1943) (determine on which side burden of proof lies by ascertaining which party would be entitled to a verdict if no evidence were offered on either side). Plaintiff offers no evidence that its sales quota for 1987 exceeded the average percentage increase in sales goals assigned to similarly situated sales representatives.
Nonetheless, the Court will not grant summary judgment with respect to plaintiff's failure to meet its 1987 quota. Under the agreement, even if plaintiff fails to meet a quota that was set in accordance with the contract, plaintiff is still excused from failing to meet the quota if more than one-half of defendant's representatives failed to meet the eighty percent requirement for that year. Plaintiff has produced a November 12, 1987, memorandum from Walt Slibeck of Sterile Design, which suggests that the year-end percentage of sales quota for Sterile Design's highest ranking region in 1987 was only seventy-three percent. Although the context of this statement is not clear, and the same memorandum contains quota figures that appear to *902 be somewhat contradictory, the Court finds that a question does remain with respect to whether more than one-half of Sterile Design's representatives fell short of the eighty percent requirement in 1987. Hence, the Court will deny defendant's motion for summary judgment with respect to plaintiff's failure to meet its 1987 quota.

IV. Hospital Products' Promotion of Other Products

The agreement provides that Hospital Products was to use its "best efforts to promote the sales of [Sterile Design products] in the Territory" and that it would "not handle any other products, whether competitive or not." In addition, the agreement provides:

Failure to Enforce: Failure of either party to enforce at any time or for any period of time any of the provisions of this Agreement shall not be construed as a waiver of such provision or of the right of the party thereafter to enforce each and every such provision.
Sterile Design argues that Dockery and Penke sold non-Sterile Design products during the 1987 calendar year, which entitled defendant to terminate the agreement under the "other products" provision. Sterile Design also argues that it did not waive this "other products" provision and that it could not be deemed to have waived it in light of the above-quoted "failure to enforce" provision.
Plaintiff states that the contract obligated only Hospital Products, Inc., to refrain from selling non-Sterile Design products, not Dockery and Penke. Plaintiff further argues that Dockery and Penke had disclosed to Custom Products that they were selling non-Sterile Design products before the agreement was executed. Plaintiff asserts that, notwithstanding the "failure to enforce" provision, Custom Products therefore waived the "other products" provision. Because Sterile Design "stepped into the shoes" of Custom Products when it assumed the agreement with plaintiff, plaintiff argues, Sterile Design is also estopped from enforcing the "other products" provision.
The Court concludes that issues of material fact remain with respect to Sterile Design's claim that it was entitled to terminate the agreement due to Hospital Products' promotion of other products. Plaintiff does not dispute that Dockery and Penke sold other products. Plaintiff has presented evidence, however, that both Custom Products and Sterile Design knew that the principals of Hospital Products were selling other products and acquiesced, albeit equivocally, to this activity.[4] Notwithstanding the "failure to enforce" provision of the contract, the possibility exists that defendant's conduct resulted in a waiver of the "other products" provision or estops defendant from relying on it to justify termination. Fritts v. Cloud Oak Flooring Co., 478 S.W.2d 8 (Mo.App.1972). A genuine issue of material fact remains with respect to whether Sterile Design waived the "other products" provision of the parties' agreement.

V. Hospital Products as a "Going Concern"

The agreement between the parties provides that Sterile Design may terminate the agreement immediately in the event that Hospital Products should cease to operate as a "going concern." Sterile Design argues that due to Hospital Products' "dormant" status after 1984, the corporation ceased to function as a "going concern", as early as mid-1984, and, thereafter, Sterile *903 Design was entitled to terminate the agreement.
Hospital Products first suggests that defendant is defense shopping and that defendant may not justify its termination of plaintiff as a sales representative at this juncture by offering reasons for termination that were not offered at the time of termination. Plaintiff further argues that defendant was always aware that Hospital Products "was a corporation established merely to act as an entity for recording the combined sales of defendant's products by Dockery and Penke ... and as a conduit for receiving and distributing to Dockery and Penke commission payments for such sales." Plaintiff adds that as of the date of plaintiff's termination as a representative, plaintiff was a corporation in good standing under the laws of the State of Nebraska. In addition, plaintiff notes that over a period of time defendant began to deal with Dockery and Penke as individuals by issuing "some" commission checks directly to either Dockery or Penke and listing Dockery and Penke separately in memoranda related to sales of defendant's products. These factors, plaintiff argues, either indicate that defendant waived the "going concern" provision of the contract or act to "collaterally estop" defendant from asserting the provision as a defense. Finally, plaintiff argues, defendant cannot assert that plaintiff ceased to be a "going concern" because for two years prior to plaintiff's termination, defendant continued to issue "1099" forms and commissions checks to "Hospital Products", which indicates that defendant continued to recognize Hospital Products as a corporation from 1984 through 1987.
As a threshold matter, the Court rejects plaintiff's argument that defendant is engaging in "defense shopping" and plaintiff's implied argument that defendant was required to announce at the time of the contract's termination every justification for said termination that was then known to defendant. Plaintiff cites In re Progressive Farmers Association, 829 F.2d 651, 656 (8th Cir.1987), and the Missouri cases cited therein in support of the proposition that defendant was required to announce its grounds for terminating plaintiff as a sales representative and could not later rely on other grounds to justify plaintiff's termination. Progressive Farmers, however, deals with the harsh remedy of forfeiture. The party seeking forfeiture was required to state its grounds for foreclosure in the notice of foreclosure. Furthermore, substantial evidence existed that, although the party seeking forfeiture knew of other grounds for forfeiture at an earlier date, it did not list those grounds in the notice of foreclosure. Thus, the party seeking forfeiture was precluded from raising grounds for forfeiture that it knew of at the time of serving notice, but failed to specify in the notice of foreclosure.
The instant case does not deal with a foreclosure on property.[5] Rather, the case at bar involves a standard sales representative contract. The Court is unaware of any general requirement under Missouri law that a party seeking to terminate a contract must announce its grounds for doing so at the time of termination and be thereafter limited to relying on only those grounds in defending a subsequent action for breach of contract.[6] Furthermore, plaintiff has offered no evidence establishing that defendant knew of Hospital Products' "dormant" status at the time of termination. This Court cannot conclude that defendant is "defense shopping", and the Court finds that defendant's failure to rely on the "going concern" provision of the contract at the time of termination does not preclude defendant from relying on said *904 provision as a defense to the instant lawsuit.
The parties' agreement specifically provides:
D. Automatic Termination: We may also terminate this Agreement immediately in the event ... (ii) You cease to function as a going concern.
The agreement does not define "going concern". Absent any definition within the contract, this Court will interpret the terms in a contract according to the usual and ordinary meaning, or "plain meaning", that they are ordinarily given. L & K Realty Co. v. R. W. Farmer Construction Co., 633 S.W.2d 274, 280 (Mo.App.1982). Defendant suggests, and this Court agrees, that such a meaning can be found in Black's Law Dictionary, (Revised Fourth Ed.1968):
GOING CONCERN. An enterprise which is being carried on as a whole, and with some particular object in view. The term refers to an existing solvent business, which is being conducted in the usual and ordinary way for which it was originally organized. When applied to a corporation, it means that it continues to transact its ordinary business.... A firm or corporation which, though embarrassed or even insolvent, continues to transact its ordinary business.

Id. at 821 (emphasis added).
Defendant notes that according to Hospital Products' Articles of Incorporation, the corporation was organized "to buy and sell hospital products". Plaintiff emphasizes that Hospital Products was created as a "conduit" for recording sales of Sterile Design products by Dockery and Penke and receiving and distributing commission payments to these individuals. This Court finds that given either purpose, Hospital Products ceased to be a "going concern" after 1984. Plaintiff does not dispute that Dockery and Penke split with the corporate entity of Hospital Products in 1984 and formed their own individual companies. Nor does plaintiff dispute that Dockery and Penke ceased to "run their money through" Hospital Products after 1984. Furthermore, that Hospital Products was a corporation in good standing with the State of Nebraska at the time of plaintiff's termination shows only that it continued to exist as a legal entity. It does not show that Hospital Products was a "going concern", according to the usual and ordinary meaning of that term, in 1987.
Plaintiff argues, however, that even if Hospital Products did cease to be a "going concern" after 1984, defendant either waived the provision or is estopped from relying upon the provision to justify termination. As the Court notes above, defendant may waive a term of a contract through its actions notwithstanding a "failure to enforce" provision in the contract. Waiver is the intentional relinquishment of a known right. Greenberg v. Koslow, 475 S.W.2d 434, 438 (Mo.App.1971). It must be shown by express declarations or conduct showing "a clear, unequivocal, and decisive act" of the waiving party showing that it was his purpose to waive the right that is "so consistent with intention to waive that no other reasonable explanation is possible." Bartleman v. Humphrey, 441 S.W.2d 335, 343 (Mo.1969). See also Errante v. Kadean Real Estate Service, Inc., 664 S.W.2d 27, 29 (Mo.App.1984); Edward L. Bakewell, Inc., v. Kroeger, 617 S.W.2d 447, 450 (Mo.App.1981). "[A] right may be waived by conscious acquiescence in its persistent violation." Greenberg v. Koslow, 475 S.W.2d at 438. Nonetheless, "[a] violation, however long continued in secrecy or obscurity can no more be said to have been invited or intentionally condoned than the depredations of a thief in the night." Id.
Estoppel is a doctrine separate from waiver. Midwest Petroleum Co. v. American Petrofina, Inc., 603 F.Supp. 1099, 1114 (E.D.Mo.1985); see generally 31 C.J.S. Estoppel § 61(b) at p. 387. Although no definition of equitable estoppel is completely satisfactory, Miskimen v. Kansas City Star Co., 684 S.W.2d 394, 400 (Mo. App.1984), and it rests largely on the facts and circumstances of the particular case, Southgate Bank and Trust Co. v. May, 696 S.W.2d 515, 521 (Mo.App.1985), estoppel is generally defined as the rule of law *905 "that precludes one from denying his own expressed or implied admission that another person has in good faith and pursuant to its purpose accepted and acted upon." Id. at 520. Unlike waiver, estoppel depends on what the adversary party is induced to do rather than what one himself intends to do. 31 C.J.S. Estoppel § 61(b) at pp. 388-389.
A party claiming estoppel must establish:
(1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment or prejudice.
Midwest Petroleum Co., v. American Petrofina, Inc., 603 F.Supp. at 1114. "The conduct or writing on which reliance is placed must be absolute and unequivocal, and must be certain to every extent, for mere argument, inference, or intendment cannot support estoppel." John Hancock Mutual Life Ins. Co. v. Dawson, 278 S.W.2d 57, 60-61 (Mo.App.1955). Furthermore, knowledge of the situation by the one against whom estoppel is asserted is required. Stenger v. Great Southern Savings and Loan Association, 677 S.W.2d 376, 383-384 (Mo.App.1984). "Estoppels are not favorites of the law and will not be lightly invoked." Smith v. Christopher, 737 S.W.2d 510, 513 (Mo.App.1987). Only when all elements of estoppel clearly appear should estoppel be applied; Id., and "every fact required to create an estoppel must appear by clear and satisfactory evidence." Stenger v. Great Southern Savings and Loan Association, 677 S.W.2d at 383. Finally, a court should look to the conduct of all the parties when considering estoppel. Abrams v. Lakewood Park Cemetery Ass'n, 355 Mo. 313, 196 S.W.2d 278, 286 (1946).
With respect to plaintiff's argument regarding waiver of the "going concern" provision, defendant is clearly entitled to summary judgment. Prior to 1984, Hospital Products was a going concern. Plaintiff has failed to produce any evidence that defendant even knew of Hospital Products' "dormant" status much less point to any "clear, unequivocal, and decisive act" indicating that Sterile Design intended to waive the agreement's "going concern" provision. As plaintiff has failed to produce sufficient evidence to carry its burden of proof, defendant is entitled to summary judgment on this issue of waiver.
Likewise, defendant is entitled to summary judgment with respect to the issue of estoppel. Plaintiff argues that defendant cannot be permitted to assert that Hospital Products was no longer a going concern after 1984 because defendant continued to recognize Hospital Products as a corporation up to its termination in 1987. Plaintiff, however, misses the point of defendant's argument. Defendant does not argue that Hospital Products was not a legitimate corporation. On the contrary, defendant emphasizes that it has always recognized Hospital Products as a corporation. Rather, defendant argues that before 1984 Hospital Products transacted business in the manner for which it was organized, and after 1984, unknown to defendant, Hospital Products did no more than exist. As this Court notes above, mere existence as a corporation cannot be equated with the status of a "going concern". Thus, that defendant continued to treat Hospital Products as a corporation after Hospital Products "went dormant" is in no way inconsistent with defendant's position that after 1984 Hospital Products ceased to operate as a "going concern".
In addition, that defendant knew that Dockery and Penke were the sole shareholders of Hospital Products does not justify estoppel. The parties' agreement clearly indicates that Dockery and Penke were the sole stockholders of Hospital Products and that they would be doing the selling for Hospital Products.[7] Thus, it cannot be *906 said that either party lacked knowledge of Dockery and Penke's original arrangement of conducting business in the form of Hospital Products. However, defendant seeks to invoke the "going concern" provision because Dockery and Penke ceased to do business in this manner. Plaintiff offer no evidence that defendant knew that Dockery and Penke ceased to sell Sterile Design products as "Hospital Products" after 1984, let alone that Dockery and Penke had, in fact, parted ways and formed their own independent companies. Indeed, plaintiff's representation that defendant persisted in issuing commission checks and "1099" forms to "Hospital Products" well after 1984 strongly suggests that defendant lacked such knowledge.[8] Furthermore, plaintiff has failed to establish good faith reliance. Plaintiff argues that Sterile Design issued "some" commission checks to Dockery and Penke individually and listed Dockery and Penke separately in "some" memoranda related to sales of defendant's products. These actions, plaintiff argues, are inconsistent with defendant's enforcement of the "going concern" provision. Plaintiff fails to allege or even suggest, however, that these actions by defendant led plaintiff to believe that Dockery and Penke could form their own companies, cease to do business as "Hospital Products" and still remain in compliance with the parties' agreement and bind defendant to the same. Furthermore, even if plaintiff did argue that Dockery and Penke relied on these acts, they are hardly so "absolute and unequivocal" as to qualify plaintiff's reliance as reasonable or in good faith.
As this Court notes above, the conduct of all the parties must be considered before applying estoppel. It should be applied only "in those situations where the countervailing equities require its application." Block v. Block, 593 S.W.2d 584, 589 (Mo. App.1979). Upon review of the extensive submissions and affidavits of both parties it becomes clear that Dockery and Penke's break with the corporate entity of Hospital Products was a unilateral action, uninfluenced by the actions of defendant. In addition, although plaintiff asks this Court to disregard the corporate entity for the purposes of the "going concern" provision and calculation of damages, it seeks refuge behind the corporate veil to avoid the "other products" provision in the parties' agreement. "A corporation is a separate entity from its stockholders and they should not be able to choose when its form is disregarded and when it is not." City of Lake Ozark, 745 S.W.2d at 801. In light of the conduct of both parties, consideration of the countervailing equities and plaintiff's failure to establish all elements of estoppel, this Court concludes that defendant is not estopped from relying on the "going concern" provision to justify plaintiff's termination.

VI. Lack of Damages

Defendant also argues that because of Hospital Products' "dormant" status after mid-1984, no damages could have resulted from said termination. In response to this argument, plaintiff asserts that since 1982, $1.5 million of Sterile Design products were sold in Iowa and Nebraska in 1986 and $1.2 million of Sterile Design products were sold in the territory through October of 1987. Plaintiff also notes that Sterile Design has continued to sell its products in the territory pursuant to long-term contracts that plaintiff secured prior to termination. Plaintiff suggests that these sales figures provide a basis for determining damages.
*907 Plaintiff explains that because Hospital Products is a subchapter S corporation, its income profits and/or losses "flow through" to its shareholders. Plaintiff suggests that by examining Hospital Products' tax returns for the years from 1982-1984 in conjunction with the tax returns of Dockery, Penke, Master Medics, Inc., and T.A. Penke & Associates, Inc., for the years from 1984-1987, damages can be calculated. In the alternative, plaintiff suggests that if the Court determines that Dockery and Penke are the proper parties, then the Court should allow plaintiff to amend its complaint to add Dockery and Penke as parties.
This Court finds that the same facts that justify defendant's reliance on the "going concern" provision as a basis for termination of the contract thwart plaintiff in its attempt to show damages. Under Missouri law, a plaintiff in a breach of contract action must show that it was damaged as a result of defendant's breach. U.S. Suzuki Motor Corp. v. Johnson, 673 S.W.2d 105, 106 (Mo.App.1984). A breach of contract without loss to the plaintiff cannot result in an award of damages. Gilomen v. Southwest Mo. Truck Center, 737 S.W.2d 499, 501 (Mo.App.1987). In this action, the parties agree that the appropriate measure of damages would be lost profits. "A mere estimate or opinion of loss of profits, unsupported by factual evidence is insufficient to support an award of lost profits." Swiss-American Importing Co. v. Variety Food Products Co., 471 S.W.2d 688, 690 (Mo.App.1971). Generally, a plaintiff need not prove loss of profits to an absolute certainty, because a defendant's interference with performance usually makes an exact valuation of performance impossible. Id. So long as no uncertainty exists as to the fact or existence of damage to the plaintiff, the amount of damage need not be shown with exactness. Ohlendorf v. Feinstein, 670 S.W.2d 930, 933 (Mo.App.1984); Coach House of Ward Parkway, Inc., v. Ward Parkway Shops, Inc., 471 S.W.2d 464, 471 (Mo.1971). Rather, plaintiff must show that anticipated profits are "reasonably certain by proof of actual facts, with present data for a rational estimate of their amount." Ohlendorf, 670 S.W.2d at 933. Such facts and "present data" include proof of plaintiff's income and expenses for a reasonable time anterior to the breach. Anderson v. Abernathy, 339 S.W.2d 817, 824 (Mo.1960); Fuchs v. Curran Carbonizing and Engineering Co., 279 S.W.2d 211, 219 (Mo.App. 1955). See generally, Jack L. Baker Cos., Inc., v. Pasley Manufacturing and Distributing Company, 413 S.W.2d 268 (Mo. 1967).
Plaintiff insists, and this Court concurs, that Hospital Products is the appropriate plaintiff in this action. "Whenever a corporation makes a contract; it is the contract of the legal entity; of the artificial being created by the charter; and not the contract of the individual members." The Bank of Augusta v. Earle, 38 U.S. (13 Pet.) 519, 587, 10 L.Ed. 274 (1839). As plaintiff notes, Hospital Products is the signatory to the agreement upon which plaintiff sues, not Dockery and Penke. As such, plaintiff must show damage to Hospital Products, not Dockery and Penke. It is self evident that the corporation cannot show lost profits. In light of Hospital Products' dormant status since 1984, it is clear that "present data" for a rational estimate of damages does not exist. Furthermore, from the foregoing it is clear that the corporation was not injured. That Dockery and Penke and their respective individual sales operations may have been injured is irrelevant. "A corporate entity is not its incorporators or shareholders; it is not a partnership or joint venture; it is, rather, another and particular kind of creature, with its own rights and duties." City of Lake Ozark v. Campbell, 745 S.W.2d 799, 801 (Mo.App.1988) quoting City of Salem v. H.S.B., 302 Or. 648, 733 P.2d 890, 894 (1987). Unlike most cases where courts indulge some uncertainty with respect to the amount of damage, plaintiff's inability to show damages does not result from defendant's interference with plaintiff's performance. Rather, it was the decision of Dockery and Penke to break with the corporate entity of Hospital Products that sacrificed Hospital Products' right to *908 claim damages and now confounds plaintiff. Therefore, this Court concludes that, even if defendant were found to have breached the parties' agreement, plaintiff could show no damages.
Accordingly, and for the foregoing reasons, defendant's motion for summary judgment will be granted.
NOTES
[1] In July of 1986, Sterile Design became a wholly owned subsidiary of Johnson & Johnson. Sterile Design, however, maintained its independent corporate status. Neither Hospital Products nor Sterile Design disputes that Sterile Design is the successor in interest to Custom Products with respect to Custom Products' agreement with Hospital Products, and the Court accepts Sterile Design's status as such for the purposes of this motion.
[2] Hospital Products' original complaint also included two counts under state law that were subsequently dismissed. Plaintiff filed this action in this Court pursuant to § 14D of the parties' agreement, whereby the parties stipulated and consented that the exclusive, proper and convenient venue for any legal proceeding related to the agreement would be in St. Louis County, Missouri. The parties also agreed that the laws of the State of Missouri were to govern the interpretation of the agreement.

This Court must apply Missouri choice of law rules to determine what state's law controls the resolution of this action. Buck v. American States Life Ins. Co., 723 F.Supp. 155, 158 (E.D. Mo.1989). Missouri applies the Restatement (Second) of Conflict of Laws approach in resolving choice of law questions with respect to contracts. Id. The Second Restatement generally favors application of the law of the state chosen by the parties. See generally Restatement (Second) of Conflict of Laws § 187 (1971). Accordingly, this Court will apply the laws of the State of Missouri in interpreting the parties' agreement and determining their respective rights under the agreement.
[3] Plaintiff has suggested that defendant terminated its contract with plaintiff two months before the time for fulfilling the 1987 quota had expired. Defendant, however, has submitted affidavits that it has always been defendant's practice not to credit sales made in the last two months of a calendar year to the accounts of sales representatives. Furthermore defendant's North Central Region Manager states, and both Dockery and Penke admit in their depositions, that even if Dockery and Penke's sales for the final two months of 1987 were credited to plaintiff's total sales for 1987, plaintiff would have fallen far short of achieving eighty percent of its 1987 sales goal. Plaintiff has failed to offer any evidence in rebuttal. Therefore, this Court will disregard plaintiff's argument that plaintiff was not provided adequate time to achieve its 1987 quota.
[4] Plaintiff's evidence with respect to Sterile Design's acquiescence is by no means conclusive. Plaintiff points to a January 28, 1987, letter from Jack Cahill of Sterile Design's Corporate Offices in Clearwater, Florida to Terry Penke, which states:

Terry, I just wanted to take this opportunity to review some of the many items which we discussed this past week. Specifically, our discussion centered around the commitment of Sterile Design to yourself. More importantly, from our discussions, we agreed that the importance of devoting our full time and attention to the promotion of Sterile Design is most important. To this end SDI expects that you will represent our products on a full time basis and that the representation of other product lines from other companies will not interfere with this full time commitment.
[5] Nor does it deal with insurance coverage. See Morris v. Reed, 510 S.W.2d 234, 240 (Mo.App. 1974) (once insurer denies liability on a given ground, it may not thereafter defend on different grounds).
[6] See, e.g., 3A Corbin on Contracts § 762 at 524-526 (1960) (Promisor who states insufficient reason for refusing to perform his promise can afterwards defend by showing that another and justifying reason existed. "An estoppel may arise, preventing the promisor from setting up his otherwise good defense; but his mere omission to mention that defense and his statement of bad reasons are not sufficient to raise an estoppel.").
[7] Paragraph 8 of the parties' agreement provides:

This Agreement has been entered into by us substantially in reliance upon the representation that the following persons control the ownership of your sales representation organization and that they shall actively and personally manage the organization on a full time day-to-day basis: [Dockery and Penke are listed as President and Vice President, respectively, and as possessing 100% interest in Hospital Products.] You shall not directly or indirectly assign this Agreement or any of its rights or obligations hereunder without our prior written consent, except that you may assign the ownership to a corporation so long as the percentage of ownership interest remains the same as stated above for each named person.
[8] Furthermore, defendant has presented evidence that Dockery continued to communicate with defendant on Hospital Products stationary through November 5, 1987, six days before plaintiff's termination.